**MIAMI HEART INSTITUTE,**
**Plaintiff–Appellee,**

v.

**Louis W. SULLIVAN, as Secretary of Health & Human Services, Defendant–Appellant.**

**No. 87–6107.**

United States Court of Appeals,
Eleventh Circuit.

March 23, 1989.

that Shipner reverted to the position.

Before TJOFLAT and FAY, Circuit Judges, and SHARP *, District Judge.

TJOFLAT, Circuit Judge:

### I.

The Miami Heart Institute is a research and medical center in Miami Beach, Florida. Sometime prior to 1981, the Institute decided to reconfigure its campus by replacing one of its older buildings—the fifty-three-year-old Mastronardi Pavilion—with a highrise tower, and three of its newer buildings with a parking garage. The project was completed in 1984. This dispute concerns the "useful life" to be assigned to the three buildings that were replaced by the parking garage for purposes of calculating the Institute's reimbursement under the Medicare Act for services provided to Medicare patients. *See* 42 U.S.C. § 1395f(b)(1) (1982 & Supp. IV 1986). Under the Act and the regulations promulgated thereunder, health care providers are entitled to recover, on an annual basis, the cost of their facilities prorated over their estimated "useful life." *See* 42 C.F.R. § 413.134 (1987).

The three buildings in question were constructed in the late 1960's and early 1970's and, under the Medicare regulations, were given an estimated useful life of thirty-three years. In 1982, after the Institute decided to replace the three buildings, it reduced their remaining useful life to two years and attempted to recover their unreimbursed cost during the calendar years 1982 and 1983. Blue Cross of Florida, the fiscal intermediary to which the Institute applied for Medicare reimbursement,[1] sum-

Dexter W. Lehtinen, U.S. Atty., Miami, Fla., Wendy A. Jacobus, Asst. U.S. Atty., Gary A. Ratner, U.S. Dept. of Health & Human Services, Office of Gen. Counsel, Dana J. Petti, Atlanta, Ga., for defendant-appellant.

Michael W. Ford, Miami, Fla., for plaintiff-appellee.

---

* Honorable G. Kendall Sharp, U.S. District Judge for the Middle District of Florida, sitting by designation.

1. Under the Medicare reimbursement scheme, a fiscal intermediary, under contract with the Secretary of Health and Human Services, determines the reimbursement to be paid a health care provider. *See generally* 42 U.S.C. § 1395h (1982 & Supp. IV 1986). A provider applies to

its intermediary for payment within three months after the close of the provider's fiscal year. *See* 42 C.F.R. § 413.24(f)(2) (1987). The intermediary reviews and audits the provider's application to determine what portion of the provider's costs are properly reimbursable. A provider dissatisfied with the "final determination [by the intermediary] as to the amount of total program reimbursement due" is entitled to a *de novo* hearing before the Provider Reim-

marily rejected the Institute's redetermination of the buildings' useful lives and denied the accelerated recovery. The Institute thereafter sought *de novo* review of Blue Cross' decision before the Provider Reimbursement Review Board. *See* 42 U.S.C. § 1395*oo* (a) (1982 & Supp. IV 1986).

Medicare regulations permit a health care provider to shorten the useful life of its facilities if the provider can establish by "clear and convincing evidence" that a redetermination is justified for one or more of the reasons set forth in the regulations. *See* 42 C.F.R. § 413.134(b)(7)(iii). For example, the useful life of a facility can be reduced when "normal wear and tear" have rendered the facility functionally obsolete, when "economic and technological changes" have rendered it unprofitable to operate, or when "climatic and other local conditions" make continued operation of the facility impracticable. *See id.* § 413.134(b)(7). In arguing its case to the Board, the Institute took the position that "climatic and other local conditions" had made the continued operation of the three buildings impossible. These conditions, it said, were created by a zoning ordinance of the City of Miami Beach, which required the Institute to provide additional parking spaces on its campus after the Mastronardi building was replaced with the highrise tower. The Institute did so by demolishing the buildings at issue and constructing a parking garage in their place.

The Board, in a written opinion, rejected as overbroad the Institute's interpretation of the phrase "climatic and other local conditions," and held that the Institute could not shorten the useful life of the three buildings since none of the reasons justifying a redetermination of useful life enumerated in the regulation were present. Additionally, the Board held that 42 C.F.R. § 413.134(b)(7)(i)(B), which precludes a provider from shortening the useful life of prematurely demolished or abandoned facilities, altogether foreclosed the Institute's claim for relief.

The Secretary of Health and Human Services affirmed the Board's decision. Thereafter, the Institute brought this suit in the district court, seeking judicial review of the Secretary's action. The district court, concluding that the agency's interpretation of 42 C.F.R. § 413.134(b)(7) was too narrow, held that the requirements of the zoning ordinance constituted "climatic and other local conditions" as a matter of law and that the Institute was entitled to a redetermination of the useful life of the buildings.[2] The court therefore reversed the Secretary's decision, and the Secretary brought this appeal.

## II.

In assessing the merits of the Secretary's appeal, we must keep two points in mind. First, we accord no deference to the district court's conclusion that the requirements of the local zoning ordinance constituted "climatic and other local conditions"; rather, we decide the case on the administrative record—as the district court did below. *See* Fed.R.App.P. 16(a). Second, as a reviewing court constrained by the Administrative Procedure Act, *see* 5 U.S.C. § 706 (1982), we must accept the Secretary's interpretation of the regulation before us if

bursement Review Board. 42 U.S.C. § 1395*oo* (a)(1)(A) (1982 & Supp. IV 1986).

**2.** In an alternative holding, the district court concluded that, because the Board's opinion failed to consider the climatic or environmental conditions at Miami Beach, the Board's decision was "clearly erroneous," even under the Board's narrow interpretation of the regulation. The court erred in reaching this conclusion. The administrative record reveals that the Institute never hinted, let alone argued, that environmental conditions justified shortening the useful lives of the three buildings. Indeed, the Institute conceded that no structural problems existed with the buildings and that it had continued to use them in rendering patient care for two and three-quarter years after the demolition of the Mastronardi building. Although the record indicates that the Mastronardi building was in a deteriorated condition when the Institute decided to replace it, this has no bearing on the condition of the three buildings at issue here. The Board's decision can not be deemed "clearly erroneous" for its failure to decide a question never presented by the health care provider, which had the burden of proving that a redetermination of useful life was in order. *See Fairfax Hospital Ass'n v. Califano,* 585 F.2d 602, 611 (4th Cir.1978).

that interpretation is "within the range of reasonable meanings that the words of the regulation admit." *Psychiatric Inst. of Washington, D.C., Inc. v. Schweiker*, 669 F.2d 812, 814 (D.C.Cir.1981); *see also United States v. Larionoff*, 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977) ("In construing administrative regulations, 'the ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation.'") (quoting *Bowles v. Seminole Rock Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)); *Grier v. Secretary of the Army*, 799 F.2d 721, 725–26 (11th Cir.1986) ("As this agency interpretation is not at odds with the text of the regulation, or plainly erroneous, it is entitled to great deference by this court."). We conclude that the Secretary's interpretation is reasonable—that it conforms to well-known canons of construction, the administrative history of the regulation, and sound policy.

The pertinent Medicare Act regulation provides as follows:

(b)(7) *Useful life.* The estimated useful life of a depreciable asset is its normal operating or service life to the provider, subject to the provisions in [subparagraph (b)(7)(i) below]. Factors to be considered in determining useful life include normal wear and tear; obsolescence due to normal economic and technological changes; *climatic and other local conditions;* and the provider's policy for repairs and replacement.

(i) *Initial selection of useful life.* In selecting a proper useful life ... such factors as an expected early sale, retirement, demolition or abandonment of an asset ... may not be used.

. . . .

(iii) *Changing useful life.* A change in the estimated useful life may be made if clear and convincing evidence justifies a redetermination of the useful life used by the provider.... [T]he factors cited in paragraphs (b)(7) and [subparagraph (b)(7)(i) above] are applicable in making such redeterminations of useful life.

42 C.F.R. § 413.134(b)(7) (1987) (emphasis added).

The Secretary read the words "climatic and other local conditions" to mean "the climate or the topography or geology of the particular geographic area in which the provider is located." The district court opted for a broader reading of the phrase that included the conditions created by the local zoning ordinance. In rejecting the Secretary's interpretation as too narrow, the district court ignored the maxim of *ejusdem generis,* one of the oldest and most respected rules of statutory construction. This venerable maxim, recognized a century ago by the Supreme Court in *United States v. Chase,* 135 U.S. 255, 260, 10 S.Ct. 756, 757–58, 34 L.Ed. 117 (1890), teaches that "when general words follow an enumeration of specific terms the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Hovater v. Equifax, Inc.,* 823 F.2d 413, 419 (11th Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 490, 98 L.Ed.2d 488 (1987). Here, the restrictive term which precedes the general phrase is "climat[e]." In accord with the maxim of *ejusdem generis,* we conclude that the Secretary acted reasonably in limiting the general phrase "and other local conditions" to include only local conditions similar to climate that affect the intrinsic usefulness of a building.

Such a construction of the language of 42 C.F.R. § 413.134(b)(7) is, moreover, necessary for a consistent interpretation of the regulation as a whole. In interpreting a regulation, "each part or section should be construed in connection with every other part or section so as to produce a harmonious whole." N. Singer, *Southerland Statutory Construction* § 46.05, at 90 (rev. 4th ed. 1984). The district court's interpretation of the regulation's phrase "climatic and other local conditions" simply cannot be squared with subparagraph (i) of the regulation which provides that "such factors as an expected early sale, retirement, demolition or abandonment of an asset ... may not be used" in determining useful life. It makes little sense to interpret 42 C.F.R. § 413.134(b)(7) to permit the

determination of useful life to be based on a planned demolition, a factor which is explicitly rendered inapplicable by subparagraph (i) of the same section. Because we have a duty to give effect, if possible, to every clause of a regulation, *see United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 520, 99 L.Ed. 615 (1955), we must reject the district court's construction since it would emasculate an entire subparagraph of the Medicare regulation.

Finally, we note that the Secretary's interpretation is consistent with the administrative history of, and policies underlying, the regulation. Prior to 1979, the Secretary's method for determining reimbursement for health care facilities permitted a provider to recoup in one payment the unreimbursed cost of a demolished facility. In that year, the Secretary promulgated a new rule requiring that such unreimbursed cost be capitalized as a deferred charge and amortized over the remaining useful life of the demolished facility. *See* 44 Fed.Reg. 3980 (1979) (adopting final rule); *see also* 41 Fed.Reg. 35,197 (1976) (proposing new rule). In promulgating the new rule, the Secretary expressed concern that the prior policy tended "to encourage demolition or abandonment of patient care assets at the expense of the Medicare program." 44 Fed.Reg. at 3981; 41 Fed.Reg. at 35,197–98. The Secretary reasoned that the remaining value of a prematurely destroyed facility should be recognized as part of a hospital's investment in the delivery of future services rather than as a cost related to patient care during the period immediately preceding the demolition. *See* 44 Fed.Reg. at 3981; 41 Fed.Reg. at 35,198.

To assure the success of the new policy, the Secretary promulgated a definition of "useful life" that would preclude a provider from shortening the useful life of a still productive patient care facility. In short, the purpose of this new definition was to distinguish the factors listed in 42 C.F.R. § 413.134(b)(7)—factors like climatic conditions that affect the intrinsic useful life of a facility—from those listed in subparagraph (i)—factors like a planned demolition or abandonment that put an artificial, premature end to the useful life of an otherwise still valuable patient care facility.[3] In promulgating the new regulation defining "useful life," the Secretary concluded, "[t]his procedure is intended to assure that providers do not inappropriately shorten the estimated useful lives of assets to increase Medicare reimbursement." 44 Fed. Reg. at 3981. It is therefore perfectly consistent with the administrative history of the regulation to construe the "useful life" provision, as the Secretary has done, in a manner that prevents the Institute from "cashing out" its still valuable buildings at the time of their premature demolition.

Accordingly, we conclude that there is no basis for second-guessing the Secretary's interpretation of the regulation defining "useful life" for purposes of Medicare reimbursement. Although the Secretary's interpretation might not have been the only one permitted by the language of the regulation, we find the interpretation to be a reasonable one. We hold, therefore, that the district court erred in replacing the Secretary's interpretation with its own.[4]

### III.

Inasmuch as the Secretary's interpretation of the regulation is reasonable and there is substantial evidence in the adminis-

---

**3.** The cost allocation scheme established by the regulation is intended to apply to any premature demolition or early disposal of a still valuable health care facility, regardless of the reasons motivating it. Thus, the loss due to demolition is allocated over the remaining useful life of the facility, notwithstanding that the demolition may have been approved by the local health planning agency, *see* 42 C.F.R. § 413.134(f)(5)(iv)(A) (1987), or that the value of the asset is lost solely as the result of involuntary conversion. *See id.* § 413.134(f)(6).

**4.** Under its own interpretation of the regulation, the district court held that the evidence mandated a redetermination of the useful lives of the three buildings as a matter of law. Under the Secretary's interpretation of the regulation, which we uphold, we find that the administrative record contains substantial evidence to support the Board's factual findings; accordingly, the Secretary's decision should be affirmed.

trative record to support the Secretary's findings, the judgment of the district court is vacated and the case is remanded. On receipt of our mandate, the district court shall enter judgment for the Secretary.

REVERSED and REMANDED.