**In re AMES DEPARTMENT STORES, INC., Eastern Retailers Service Corporation, et al., Debtors.**

**Bankruptcy Nos. 90B–11233 (HCB) to 90B–11285 (HCB).**

United States Bankruptcy Court, S.D. New York.

Nov. 13, 1990.

**162**

Skadden, Arps, Slate, Meagher & Flom, New York City by Edward J. Meehan, James P.S. Leshaw, for debtors.

Bruce H. Roswick, New York City, for Sidcor Westmont Associates.

## DECISION

HOWARD C. BUSCHMAN, III,
Bankruptcy Judge.

Ames Department Stores, Inc. ("Ames") seeks an order pursuant to Sections 365(b) and (f) of the Bankruptcy Code, 11 U.S.C. § 365(b) and (f) (1986) authorizing a debtor subsidiary, Zayre Illinois ("Zayre") (collectively, the "Debtors"), to assume a lease of non-residential real property located in Westmont, Illinois (the "Lease"), and assign it to Schottenstein Stores Corporation ("Schottenstein").

### I

Zayre entered into the Lease with Du Pag Trust Company as trustee for the landlord on April 15, 1969. Sidcor Westmont Associates ("Sidcor" or the "Landlord") purchased the original landlord's interest in the property in 1986.

The Lease covers approximately 81,550 square feet of store premises located in one of two buildings abutting a common parking area and lying perpendicular to each other [the two buildings and contiguous land owned by the landlord are hereinafter referred to as "Westmont"]. The two buildings contain 15 stores rented to various businesses. The Lease premises comprise 56% of the gross leasable space of all the stores. Tr. 49 [1]. Zayre is the anchor tenant, Tr. 134, and has operated a retail department store in the premises. Since Ames acquired Zayre, the store has operated under the Ames name.

The various stores located in Westmont include Ames, a hair dresser, a women's clothes store, Kinney's Shoes, a dentist, a currency exchange, a dry cleaner, Trax Auto, Apple Foods, Hallmark Gifts, a travel agency, a food store, Walgreen Drugs and Glidden Paint. Tr. 113–121. The Ames, women's clothes and Kinney Shoes stores are closed. Tr. 135 Another tenant, Hallmark Gifts, is threatening to close. Tr. 138.

The Landlord contends [2] that, notwithstanding the absence of a use clause in the Lease restricting the use of the premises to a department store, the assignment to Schottenstein violates the requirement of section 365(b)(3)(D) of the Bankruptcy Code, 11 U.S.C. § 365(b)(3)(D) (the "Code"), that the tenant mix in a shopping center be preserved in the assignment of a lease pursuant to section 365(f) of the Code. Schottenstein plans to operate a furniture store in most of the premises and sublet the remainder.

The Lease, however, does not afford the Landlord any right to object to a tenant's assignment or subletting. Under the Lease, Zayre has the absolute right to assign and sublet the premises:

---

**1.** Citations to "Tr." refer to the transcript of the hearing on October 18, 1990.

**2.** Other objections of the Landlord were overruled by this Court during the hearing on October 18, 1990:

(1) The Landlord objected to the assignment on the ground that the Lease permits only a department or retail store in the premises. The Lease, however, contains no "use" clause or any other clause limiting the use of the premises to a department store or otherwise excluding a furniture store. Although argued by the landlord, use clause cannot be implied in these circumstances where none is contained in the Lease and, as discussed below, the Lease is freely assignable by its terms.

(2) The Landlord also asserted that an assignment to Schottenstein will result in Schottenstein's making various alterations in violation of the Lease and damaging the building. The Lease, however, permits alterations and the evidence established that the alterations planned would not damage or affect the integrity of the building.

(3) According to the Landlord, allowing Schottenstein to close the store for 120 days in order to perform the intended alterations in the premises would violate the percentage rent clause contained in the Lease. Because the Lease, in sections 8.1 and 9.1, expressly allows alterations by the tenant, it contemplates closing the store to make them notwithstanding the percentage rent clause and any implication of an alleged duty to stay open. The evidence showed that the 120 day period was not unreasonable.

*[t]enant shall have the right to assign its interest* in this lease and *to sublet all or any portion of the Demised Premises without the consent of the landlord.* Tenant shall promptly upon such assignment or subletting deliver to the landlord a copy thereof ... Notwithstanding any assignment of Tenant's interest in this lease or any subletting of the whole or any part of the Demised Premises, Tenant shall remain primarily liable for the performance of all agreements of the Tenant hereunder.

Lease § 17.1 (emphasis added).

Since Sidcor purchased Westmont in 1986, it did not choose the majority of current tenants. Their leases were already in place. Tr. 115, 118. Sidcor's only control over "tenant mix" is by favoring a former tenant upon renewal of its lease. Tr. 118.

Schottenstein plans to operate a Value City furniture store in a portion of the premises and sublet the remaining 20,000 square feet to financially secure tenants. Tr. 178. It is acquiring at least two other Chicago stores from this estate, also to be operated as Value City furniture stores. Two years ago, Schottenstein's Value City stores were ranked as the 7th largest furniture chain in the nation. Tr. 169–70. Sales have increased dramatically since then. The furniture is priced to be attractive to middle income families. *Id.*

Value City stores are located in various community shopping centers in Ohio, Pennsylvania, Indiana, Virginia and Connecticut. Tr. 172, 174–75. These centers contain usually 5–6 shops and provide services similar to those at Westmont. Tr. 173. In some centers, Schottenstein is the anchor tenant. Tr. 174–75. Schottenstein highly promotes its merchandise through various media channels and intends to emphasize advertisement during the opening period, Tr. 170; *i.e.*, it devotes 8% of an average volume of sales of $10 million to advertising; other furniture or department stores invest only 3–4% of their sales to advertising. Tr. 170. Although Zayre has not paid a percentage rent to the Landlord in the last 3 years, Schottenstein believes it would "have as good an opportunity as the Ames operation to pay percentage rent sometime in the future." Tr. 180.

## II

Section 365(f)(2) of the Code permits assignments of executory contracts and unexpired leases only if the lease is assumed and "adequate assurance of future performance of such contract or lease is provided...." 11 U.S.C. § 365(f)(2). With respect to a leasehold in a shopping center, adequate assurance of future performance contemplates that there will be no substantial decrease in percentage rent as a result of the assignment and no failure to comply with radius, location, use and exclusivity provisions of the lease other leases in the center or a financing or master agreement. 11 U.S.C. § 365(b)(3).[3] Section 365(b)(3)(D) further provides:

that assumption and assignment of such lease will not disrupt any tenant mix or balance in such shopping center.

11 U.S.C. § 365(b)(3)(D).

A landlord seeking to avail itself of the protection of section 365(b)(3) bears the burden of proof that the area in question is a shopping center. *E.g. In re Joshua Slo-*

3. Section 365(b)(3) states:
For the purposes of paragraph (1) of this section and paragraph (2)(B) of subsection (f), adequate assurance of future performance of a lease of real property in a shopping center includes adequate assurance—
(A) of the source of rent and other consideration due under such lease, and in the case of an assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the lease;
(B) that any percentage rent due under such lease will not decline substantially:
(C) that assumption and assignment of such lease is subject to all the provisions thereof, including (but not limited to) provisions such as radius, location, use, or exclusivity provision, and will not breach any such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center;
11 U.S.C. § 365(b)(3).

*cum, Ltd.*, 99 B.R. 250, 257 (Bankr.E.D.Pa. 1989).

■ The term "shopping center" is to be strictly construed but is not expressly defined in the Code. 2 L. King, J. Lewittes, H. Miller, P. Murphy, J. Samet, W. Stern, 2 *Collier on Bankruptcy* ¶ 365.04[3] (15th ed. 1989). The language of the statute, however, gives meaning to the term by speaking of such clauses as radius, location, use, and exclusivity clauses, of the store lease, other leases, and financing and master agreements relating to the premises as a whole. These provisions and similar provisions such as common hours clauses and so called anchor clauses committing a tenant only so long as another tenant remains are common to shopping centers. They serve to define the term as one contemplating a group of independently owned stores that are contractually interrelated as to the use of store premises contiguous to a common area and thereby planned as a single unit. *Hoffman v. 905 International Stores, Inc. (In re 905 International Stores, Inc.)*, 57 B.R. 786, 787–88, 14 Collier Bankr.Cas.2d (MB) 1016 (E.D. Mo.1985); *see also In re Goldblatt Bros., Inc.*, 766 F.2d 1136, 1140–41, 13 Collier Bankr.Cas.2d (MB) 115, Bankr.L.Rep. (CCH) ¶ 70,642 (7th Cir.1985). Through a pattern of legal interrelationships, the developer landlord creates and maintains balanced group of tenants, thereby maximizing the potential benefits to the landlord and tenants alike. Brooks, *Shopping Center Tenants in Bankruptcy: the Effect of the 1984 Code Amendments*, 1988 U.Ill.L. Rev. 725, 735–36 (1988).

This interrelationship distinguishes a shopping center under the Code from a strip or series of stores on main street. A strip or downtown shopping district, like a shopping center, may afford common parking but the tenants may not have the legal protections *inter se* such as Congress sought to protect in section 365(b)(3). *In re Joshua Slocum*, 99 B.R. at 256.

■ Under this analysis, it is readily apparent that Sidcor did not carry its burden of proof on the issue of whether Westmont is a shopping center under the Code. The Zayre Lease provides an unrestricted right of assignment. No evidence was introduced indicating a master agreement creating common store hours, joint advertising, or otherwise affording other tenants rights with respect to operation of the Lease premises. The only radius clause in the Lease serves to protect Zayre and Ames by limiting the Landlord's ability to lease other premises for use as a department store while the Zayre premises are operated as a department store. Lease §§ 2.2(A)(1) and (C). Simply put, there is nothing in this record evidencing any right enforceable by the Landlord or other tenants of the nature referred to by Congress in Section 365(b)(3).

■ To be sure, the Westmont area may physically look like a small shopping center and Schottenstein has referred to it as a shopping center. Tr. 173. Physical criteria, such as common ownership of contiguous stores, the existence of an anchor tenant, and shared parking facilities, serve a threshold purpose in determining whether a given area is a shopping center. There must be some physical resemblance to a shopping center before section 365(b)(3) can apply. *See ·In re Goldblatt Bros.*, 766 F.2d at 1140–41 (physical criteria are significant but never determinative). While such physical appearance is one thing, the statute indicates that Congress was concerned with protecting the legal relationships among tenants and with landlords contained in leases and other documents. It is the absence of such legal relationships that governs here. *In re Goldblatt Bros.*, 766 F.2d at 1141.

### III

■ Even were a shopping center to be defined by its physical characteristics rather than legal interrelationships, it would be anomalous to interpret section 365(b)(3)(D) to preclude Zayre from assigning the Lease when the Lease itself affords Zayre with the unfettered right to assign and sublet regardless of impact on tenant mix.

The language of section 365(b)(3)(D), read in isolation, does not refer to contrac-

tual protection. It is, nevertheless, clear that section 365(b)(3)(D) must be interpreted to refer to contractual protections and not undefined notions of tenant mix.

First, the statutory language of section 363(b) in its entirety indicates that Congress' concern was protecting contractual rights. Section 365(b)(1)(A) requires there be "adequate assurance" of prompt cure of a default and, where a default has occurred, "adequate assurance" of future performance of an unexpired lease in order for the court to approve assignment of an unexpired lease. *E.g., In re Natco Industries, Inc.,* 54 B.R. 436, 440–41 (Bankr.S.D. N.Y.1985). If a lease is to be assumed and assigned, Section 363(f)(2) requires, regardless of prior default, that there be adequate assurance of performance of the lease by the putative assignee in order for the court to approve the assignment. Section 365(b)(3) defines such "adequate assurance of future performance of a lease of real property in a shopping center" to include non-disruption of tenant mix. The statute itself thus directs tenant mix inquiry to contractual provisions rather than general notions of tenant mix argued by the Landlord here.

Second, the legislative history confirms that the plain focus of the statute is on contractual protection:

A shopping center is often a carefully planned enterprise, and though it consists of numerous individual tenants, the center is planned as a single unit, often subject to a master lease or financing agreement. Under these agreements, the tenant mix in a shopping center may be as important to the lessor as the actual promised rental payments, because certain mixes will attract higher patronage of the stores in the center, and thus a higher rental for the landlord from those stores that are subject to a percentage of gross receipts rental agreement. Thus, in order to assure a landlord of his bargained for exchange, the court would have to consider such factors as the nature of the business to be conducted by the trustee or his assignee, whether that business complies with the requirements of any master agreement, whether the kind of business proposed will generate gross sales in an amount such that the percentage rent specified in the lease is substantially the same as what would have been provided by the debtor, and whether the business proposed to be conducted would result in a breach of other clauses in master agreements relating, for example, to tenant mix and location.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 348–49 (1977), *reprinted in* 1978 U.S.Code Cong. & Ad.News 5963, 6305.[4]

There being no such contractual agreements or provisions here, and the Lease itself freely permitting assignment and subletting, it is plain that Zayre's assignment to Schottenstein will not violate section 365(b)(3)(D). Seeking to disregard the plain meaning of the statute and its legislative history, the Landlord contends that a according to the Zoning Ordinance 1990, Village of Westmont, Illinois § 10.06(4)(a), (c) furniture stores are "low volume"

---

**4.** Prior to 1984, subsections 365(b)(3)(C) and (D) empowered courts to approve a debtor's assumption and assignment of a shopping center lease so long as it would not "breach substantially" a contractual provision such as a radius, location, use, or exclusivity provision, *see* 11 U.S.C. § 365(b)(3)(C) (1981), or "disrupt substantially" the shopping center mix or balance, *see* 11 U.S.C. § 365(b)(3)(D) (1981). In 1984, Congress deleted the qualifier "substantially" from both subsections in order to overrule case law allowing assumption and assignment at some, but not substantial, variance with contractual protections in the lease. *See* S.Rep.No. 65, 98th Cong., 1st Sess. 67, 68 (1983). (In practice, the presence of the qualifier "substantially" has enabled trustees to ignore the use clause of the leases. This violates the assigned lease and other agreements and, thereby, disrupts the tenant mix to the detriment of the other tenants of the shopping center). The purpose of the amendments was to ensure "the lessor and other tenants [maintain] the benefit of the *original* bargain with the debtor." *Id.* (emphasis added). This legislative history clearly shows that Congress intended Section 365(b)(3) to preserve a landlord's bargained-for protections expressed in the terms of the lease and related agreements. On the other hand, Section 365(b)(3) would be transformed from a shield protecting a landlord's pre-bankruptcy rights into a sword allowing a landlord to create unilaterally various contractual provisions, *i.e.,* a use clause, where none existed prior to bankruptcy.

stores and require 3 times less parking place than department stores ("high volume" stores). It does not contend, however, the ordinance grants any rights to preserve tenant mix.

Moreover, this construction of section 365(b)(3)(D) is consistent with the notion that a court should avoid infringement of property rights and construe statutes so as to avoid creating possible constitutional problems. *See, e.g., United States v. Security Indus. Bank*, 459 U.S. 70, 103 S.Ct. 407, 412, 74 L.Ed.2d 235 (1982) (Section 522 of the Code should not be given retroactive effect so as to obviate the constitutional argument that retroactive invalidation of liens may be an unconstitutional taking in violation of the Fifth Amendment).

■ Here, the same principle holds: section 365(b)(3)(D), enacted in 1978 should not be read, if at all possible, retroactively to nullify property rights, *i.e.*, Zayre's right to freely assign, created in a lease executed in 1969.

The foregoing constitutes this Court's findings of facts and conclusions of law pursuant to rule 7052 of the Rules of Bankruptcy Procedure. An order is to be entered approving Zayre's assumption and assignment of the Lease.

Settle Order.