**In re AMES DEPARTMENT STORES, INC., Eastern Retailers Service Corporation, et al., Debtors.**

**Bankruptcy Nos. 90B–11233 (HCB) through 90B–11285 (HCB).**

United States Bankruptcy Court, S.D. New York.

Jan. 2, 1991.

Skadden, Arps, Slate, Meagher & Flom, New York City by Judy F. Chin, for debtors.

Katz, Randall & Weinberg, Chicago, Ill. by Timothy F. Kocian, Siegel, Sommers & Schwartz, New York City by Paul Milbaur, for Pioneer Bank and Trust Co.

## DECISION

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

The debtor, Zayre Illinois Corp. ("Zayre Illinois"), seeks an order permitting it to assign to Schottenstein Stores Corp. ("Schottenstein") an unexpired lease of non-residential real property pertaining to a store located in River Grove, Illinois and located within a group of stores in an area known as The Thatcher Woods Shopping Center (the "Lease"). Schottenstein plans to operate a furniture store in part of the premises and sublease the remainder, all as permitted by the terms of the Lease.

### I

The facts relevant to this motion are undisputed, developed through receipt of proffers by the attorneys, certain exhibits at the hearing held on November 29, 1990, and deposition testimony subsequently designated by the parties.

The Lease was entered into on June 7, 1965, between a wholly owned subsidiary of Zayre Corp., known as Zayre of Illinois, Inc. ("Zayre of Illinois"), as tenant and Pioneer Trust and Savings Bank as trustee under a trust known as Trust 14900, a predecessor in interest of the same bank as trustee under a trust known as Trust 21000, the current landlord ("Pioneer"). The Lease is a 20–year lease with four renewal options of five years each. The Lease was negotiated by representatives of Zayre Corp. with Samuel Alexander, an attorney and co-equal general partner of River Grove Development that operates and is beneficial owner of Thatcher Woods Shopping Center ("Thatcher Woods"). Alexander Depo. pp. 23–24. It was of no

concern to the owner whether the lease was held by Zayre Corp. or a subsidiary. Alexander testified:

Q. Was there any discussion between you and [the Zayre Corp. representatives] about who the entity would be that signed the lease for the tenant?

A. I can't recall such a discussion. I know at some point or other, whether it was at this meeting or subsequently, I was told that they were putting all of their Chicago stores into a zone under the aegis Zayre of Illinois but that that would be of no concern to us because the parent company with whom we had negotiated with was going to guarantee the lease.

Alexander Depo. p. 31.

The Lease pertains to one of four anchor stores at Thatcher Woods. The other anchor stores are a supermarket known as Dominick's Finer Foods, Walgreen's Drug Store and Gold–Standard Liquors. The Gold–Standard premises were initially rented to National Tea Co., a supermarket. Other tenants include Baskin Robbins Ice Cream Co., a beauty salon, a currency exchange, a video rental store, a shoe store, a clothing store, Dunkin Donuts, a blood center, a health food store, a dry cleaners, a laundromat and a restaurant. The anchor stores and other stores on the site abut three sides of a common parking lot. Other stores and a gas station situated on adjacent premises owned by the landlord abut the parking lot. Ex. 62.

The Lease does not expressly restrict use of the premises in any fashion; nor do any of the leases of existing tenants restrict in any fashion the use of the Zayre of Illinois premises. Unlike the Lease, the remaining leases, except for Walgreen's, Dominick's, and Baskin Robbins, contain clauses restricting the use of the store premises to which each lease pertains. The Gold–Standard, Dominick's, Walgreen's and Baskin Robbins leases contain exclusivity provisions. None of these clauses would be breached by use of the Zayre of Illinois premises for a furniture store. The leases for several stores contain a radius clause barring the tenant from establishing another store within a specified distance. Small store leases have a common hours clause. The Lease contains no such clauses. The various leases refer to a merchant association which has been inactive in recent years. There is no master contract covering all tenants. No lease is terminable by a tenant on grounds of assignment or termination of an anchor store lease.

The Lease provides some constraint on other premises within Thatcher Woods. Without the tenant's consent, the height of other stores' marquees and parapets is restricted; exterior signs, except for stores belonging to regional or national chains, are prohibited. Lease ¶ 2A. So long as the Zayre of Illinois premises are used as a department store, no other premises in Thatcher Woods may be used for an apparel store, shop store, or drug store except for those belonging to a national or regional chain or another department store with certain exceptions.

Furthermore, the Zayre of Illinois Lease, in paragraph 17, precludes assignment by the tenant except to affiliates. That paragraph states, in pertinent part:

(A) Tenant may not assign its interest in this lease or sublet the entire demised premises to any person or business organization without first giving Landlord notice of the intended assignment or intended subletting and the nature of the business intended to be conducted by such person or business organization and the effective date of the intended assignment or subletting. If within twenty days after the giving of such notice by Tenant to Landlord, Landlord shall give notice to Tenant that it elects to terminate the term of the lease as of the intended date of said assignment or subletting, then the term of this lease shall terminate as if said intended date was originally fixed for the termination thereof.

.     .     .     .     .

(B) *Notwithstanding the provisions of the foregoing Section (A) Tenant may at any time during the term of this lease assign its interest in this lease or sublet the whole or any part of the*

*demised premises without Landlord's consent to (i) any business organization affiliated with Tenant,* (ii) to any business organization resulting from the consolidation or merger of Tenant with any other business organization or organizations, or (iii) to any business organization which alone or together with affiliated business organizations shall acquire all or substantially all of the store operations of Tenant and its affiliated business organizations. *For the purposes of this lease, a business organization shall be deemed to be affiliated with any corporation (a) if such business organization controls said corporation either directly by ownership of a majority of its voting stock* or of such minority thereof as to give it substantial control of said corporation, or indirectly by ownership of such a majority of the voting stock of another business organization so controlling said corporation, or (b) if said business organization is so controlled by another business organization so controlling such corporation, or (c) if said business organization and said organization are substantially controlled by the same stockholders or their families.

Lease § 17(A), (B) (emphasis added).

Zayre Illinois transferred the Lease to its 100% parent company, Zayre Corp. prior to 1986. Presumably because its main interest concerning the lease assignment lay in having Zayre Corp.'s guarantee of the tenant's obligations under the Lease, *See* Alexander Depo. p. 31, and because Zayre Corp. fell within the entities listed in paragraph 17(B) of the Lease, Pioneer did not dispute that assignment. Pursuant to the Lease terms granting extension options, the Lease was extended by Zayre Corp. in 1986 for five years.

Zayre Corp. and Ames Department Stores, Inc. entered into an agreement on September 15, 1988 providing for the sale by Zayre Corp. and the purchase by Ames of substantially all of the Zayre Corp. dis-

count store assets consisting of some 392 stores. In contemplation of that transaction, the Lease was assigned by Zayre Corp. to another wholly owned corporation, Zayre Illinois, on October 25, 1988, as part of an assignment of some forty leases. Zayre Illinois was formed in 1967 and between 1968 and 1988 held title to real estate in Danville, Illinois. Zayre Corp. sold all of the stock issued by Zayre Illinois and certain other wholly owned subsidiaries to Ames. Zayre Illinois continues to hold the leasehold interest of the Thatcher Woods Lease, and, when its bankruptcy petition was filed on April 25, 1990, held some 39 other leases. Since the sale of Zayre Illinois stock to Ames in October 27, 1988, the Zayre Illinois store at Thatcher Woods has been styled an Ames Department store. Zayre Illinois has continued as a wholly owned Ames subsidiary. The Lease itself was never assigned to Ames. By letters dated March 14 and April 21, 1989, Pioneer asserted that the Lease had been terminated because, in its view, the transaction was an assignment in violation of paragraph 17 of the Lease.

Schottenstein plans to use most of the Lease premises as a furniture store and to sublet the remainder.

Rather than assert that the assignment to Schottenstein is impermissible under paragraph 17(A) of the Lease,[1] Pioneer asserts: (i) the Lease was terminated prior to bankruptcy by the Zayre Corp.'s sale of its discount store assets through the assignment from Zayre Corp. to Zayre Illinois and the sale of the Zayre Illinois stock to Ames; (ii) that the Lease implicitly prohibits the use of the premises for any purposes other than as a department store and, therefore, the assignment may not be approved in light of section 365(b)(3) of the Bankruptcy Code, 11 U.S.C. § 365(b)(3) (1990); and (iii) the planned use by Schottenstein will disrupt the tenant mix of the shopping center also in violation of section 365(b)(3).

---

**1.** At the hearing, Pioneer conceded that Section 17(a) of the Lease is of no force and effect with respect to the assignment by Zayre Illinois, a debtor-in-possession, to Schottenstein in light of §§ 365(f)(1) and (f)(3) of the Bankruptcy Code, 11 U.S.C. §§ 365(f)(1), (f)(3) (1990).

Zayre Illinois conversely contends (i) since the anti-assignment clause of the Lease, paragraph 17, permits assignment to an affiliate and does not contain a change of control provision, the re-assignment to Zayre Illinois even in contemplation of the Ames transaction did not violate the Lease since the Zayre Corp. guaranty remains in place and Zayre Illinois remains an extant corporation; (ii) because the use clause of the Lease is unlimited, use of the premises as a furniture store will not violate the Lease; (iii) Thatcher Woods is not a "shopping center" as that term is employed in section 363(b); and (iv) even were Thatcher Woods a "shopping center", the planned use violates no provision of the Lease or any other lease or agreement relating to the shopping center that bears on tenant mix and therefore does not violate section 365(b)(3)(D).[2]

## II

The principal issue in this proceeding is whether the Lease was terminated pre-petition by the Ames transaction accomplished through assignment of the Lease by Zayre Corp. to Zayre Illinois and Ames purchase of Zayre Illinois stock. It is indisputable that the assignment by Zayre Corp. to Zayre Illinois by itself lay within the express permission of paragraph 17(B) of the Lease. A landlord can hardly complain of an assignment of a lease in accordance with its terms. Pioneer's claim of termination thus rests on its contention that Ames was purchasing the Zayre discount stores and that no such assignment should be recognized where it was in contemplation of the sale of the stock issued by the assignee. The linchpin of this contention is the argument that the sale of Zayre Illinois stock to Ames in these circumstances constitutes an impermissible assignment of the Lease.

■■■ The parties agree that Illinois law governs this issue. In Illinois, it is settled that the transfer of all of the stock issued by a tenant corporation does not effect an

assignment of the tenant's lease unless the lease so provides. *National Bank of Albany Park in Chicago v. S.N.H., Inc.*, 32 Ill.App.3d 110, 336 N.E.2d 115, 123 (1st Dist.1975); *Associated Cotton Shops, Inc. v. Evergreen Park Shopping Plaza of Delaware, Inc.*, 27 Ill.App.2d 467, 170 N.E.2d 35, 37–38 (1st Dist.1960); Kranzdorf, *Problems of the Developer*, 1965 U.Ill.L.F. 173, 181 (1965). In *National Bank of Albany*, where the lease precluded assignment but did not include a provision deeming a change of control of the corporate tenant to constitute an assignment, the court held:

> In *Assoc. Cotton Shops v. Evergreen Pk. Shopping, supra,* we stated at 27 Ill. App.2d [at] 475, 476, 170 N.E.2d 35 that provisions in a lease are generally strictly construed against a lessor and that the ordinary provisions in a lease prohibiting assignments or subletting do not apply where the stockholders or corporate lessees dispose of all their stock. We there recognized that a lease may by express provision prohibit the sale of corporate stock when it changes the control of the corporation. The foregoing principles apply with equal force to the instant case. Here the lease did not provide any prohibition as to the sale or transfer of the stock ownership of the original corporate lessee. The contention of [defendant purchaser] although controverted by plaintiff Bank, is that the corporate ownership of [tenant] was purchased by [first owner] and thereafter by [defendant] and was not an assignment or subletting of the lease itself.... If the determination upon remand is that the acquisition was of the stock ... such transfer would not authorize a termination at the election of the lessor within the provisions of paragraph 15(b) of the lease. In such event, the leasehold rights would remain in [the corporation] as an entity distinct from the transferee of its stock.

*National Bank of Albany*, 336 N.E.2d at 123.

---

**2.** This matter is a core proceeding arising under Title 11 of the United States Code. *See* 28 U.S.C. § 157(b)(2)(N) and (O) (1984).

This rule in Illinois accords with the rule adopted in other jurisdictions. *See Alabama Vermiculite Corp. v. Patterson,* 124 F.Supp. 441, 445 (W.D.S.C.1954); *Ser-bye Corp. v. C.P. & G. Markets, Inc.,* 78 Cal. App.2d 915, 179 P.2d 342 (2d Dist.1947); *Burrows Motor Co. v. Davis,* 76 A.2d 163, 164 (D.C.1950); *Posner v. Air Brakes & Equipment Corp.,* 2 N.J.Super. 187, 62 A.2d 711, 714 (N.J.Super.1948); *Rubinstein Bros v. Olee of 34th St., Inc.,* 101 Misc.2d 563, 421 N.Y.S.2d 534, 538 (N.Y.Civ.Ct. 1979). As stated by a leading treatise:

> The ordinary restriction against tenant-transfer is aimed at transfers of the leasehold interest. It does not bar transfer of stock control of a corporate tenant. Thus, the ordinary non-assignment clause, no matter how well drawn otherwise, may be circumvented in the case of a corporate tenant by a change in stock control....

1 M. Friedman, *Friedman on Leases* § 7.3031 (2d ed. 1983) (footnote omitted). The rule is clear: the sale of the Zayre Illinois stock to Ames did not constitute an assignment of the Lease since the Lease, although the owner was represented by an attorney when it entered the Lease, did not contain a change of control provision.

■ From that notion, it follows that the assignment to Zayre Illinois in contemplation of the Ames transaction did not fall within the prohibition of paragraph 17(A) of the Lease. Pioneer, nevertheless, argues that Zayre Corp. should not have been able to sell the Lease indirectly to Ames through a sale of the stock of Zayre Illinois when it would be precluded from directly assigning the Lease to Ames. The *National Bank of Albany* Court, however, held precisely to the contrary. So strong, moreover, is the rule that a sale of all of the stock of a corporate tenant does not constitute an assignment of the tenant's lease, absent a change of control provision in the lease, that practitioners are well advised to include such a provision, Kranzdorf, *Problems of the Developer, supra.* Courts have, therefore, held that the rule applies

even where an assignment of the lease was rejected by the landlord and the rejected assignee then proceeded to purchase the stock of the corporate tenant. *Burrows Motor Co.,* 76 A.2d 163 (reversing lower court holding that corporate tenant could not sell its stock to rejected assignee, and thereby accomplish indirectly a practical result it could not accomplish directly); *Rubinstein Bros.,* 421 N.Y.S.2d 534. As stated by the *Rubinstein* Court:

> A landlord entering a lease with a corporate tenant should be presumed to know that it is an artificial entity with a life distinct from the individuals who may from time to time be its owners. If a landlord wished to protect itself against such vicissitude, it could easily write into the lease a condition subsequent. One can certainly not be implied, however.

421 N.Y.S.2d at 538.

It is plainly apparent that this corollary to the general rule will be followed in Illinois. It proceeds from the same distinction between an assignment of a lease and sale of the stock issued by the tenant twice drawn by the Illinois Appellate Court in *National Bank of Albany* and *Associated Cotton Shops.* Indeed, in formulating the general rule, the *Associated Cotton Shops* Court cited favorably to *Burrows,* which followed the distinction even though the stock of the tenant was sold with the purpose to avoid the landlord's refusal to consent to the assignee.

In the instant case, the facts are less egregious than in *Burrows* and *Rubinstein* where the landlord rejected an assignee and then the stock of the tenant was sold to the assignee notwithstanding the objection. Here, there was no such subterfuge. Rather, the transaction was structured according to the Lease terms. Had the original landlord desired to terminate the Lease on a change of control of the tenant, it should have bargained for and obtained such a provision. It failed to do so. Thus, there was, as a matter of law, no termination.[3]

---

**3.** Pioneer attempts to draw some strength from an opinion by the United States District Court

for the Northern District of Illinois in denying a motion by Zayre Illinois, Zayre Corp. and Ames

Such a result in this case is, moreover, highly equitable. In light of the owner's testimony that it was concerned only with receiving the Zayre Corp. guarantee and given that the Zayre Corp. guarantee will remain in place notwithstanding the assignment to Schottenstein, the owner will receive the full benefit of its bargain.

### III

■ Pioneer's claim that the Lease implicitly restricts use of the premises to a department store is also contrary to Illinois law. Illinois courts generally strictly construe lease provisions against a lessor. *See, e.g., National Bank of Albany*, 336 N.E.2d at 123.

Here, the Lease contains no provision restricting use of the premises to a department store or excluding a furniture store. At most, the Lease states: "Landlord agrees that as long as a department store or a junior department store shall be operated in the demised premises...." Lease ¶ 2(B). This phraseology contemplates possible use of the premises for purposes other than a department store or junior department store. Similarly, paragraph 17(A), quoted above, precludes subletting only the entire premises. Without restraint on the goods to be sold or services to be performed by a sub-tenant, it permits

to dismiss Pioneer's complaint seeking a declaration that the Lease had terminated on the grounds considered here. Pioneer makes no contention, however, that the opinion precludes determination of this issue on the merits. As that opinion indicates, moreover, the district court did not cite to or discuss any Illinois authorities. Furthermore, the Court's reasoning that Pioneer's amended complaint should stand was apparently grounded on the notion that Zayre Corp. formed a subsidiary in order to consummate the Ames transaction. Opinion pp. 746–47. Why that should make a difference in light of the authorities discussed in the text of this Opinion is not at all clear. In any event, the facts undisputed here confirm that the Lease was assigned to a subsidiary which was in existence long before the Ames transaction.

**4.** Section 365(b)(3) states:
For the purposes of paragraph (1) of this section and paragraph (2)(B) of subsection (f), adequate assurance of future performance of a lease of real property in a shipping center includes adequate assurance—

partial subletting as Schottenstein contemplates. Nothing in the Lease restricts a tenant's or assignee's use of the premises in any fashion. To erect such a constraint would change the bargain agreed to by the parties to the Lease. Leases are not to be so construed.

### IV

■ Notwithstanding the terms of the Lease permitting unrestricted use of the premises, Pioneer contends that an assignment to an assignee contemplating a different use of the premises thereby changes the tenant mix of the stores at Thatcher Woods and thus cannot be approved in light of section 365(b)(3)(D) of the Bankruptcy Code.[4] The Debtor contends that section 365(b)(3)(D) is inapplicable since Pioneer has not met its burden of proving that Thatcher Woods is a shopping center. It further contends that section 365(b)(3)(D) does not apply since there are no terms in the Lease that preserve tenant mix.

### A

It is undisputed that the configuration of Thatcher Woods passes the threshold test of physical resemblance to a shopping center. *See, e.g., In re Goldblatt Bros. Inc.*, 766 F.2d 1136, 1140–41, 13 Collier Bankr. Cas.2d (MB) 115, Bankr.L.Rep. (CCH)

(A) of the source of rent and other consideration due under such lease, and in the case of an assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the lease;
(B) that any percentage rent due under such lease will not decline substantially;
(C) that assumption and assignment of such lease is subject to all the provisions thereof, including (but not limited to) provisions such as radius, location, use, or exclusivity provision, and will not breach any such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center; and
(D) that assumption and assignment of such lease will not disrupt any tenant mix or balance in such shopping center.
11 U.S.C. § 365(b)(3) (1990).

¶ 70,642 (7th Cir.1985), *Hoffman v. 905 International Stores, Inc. (In re 905 International Stores, Inc.)*, 57 B.R. 786, 14 Collier Bankr.Cas.2d (MB) 1016 (E.D.Mo.1985); *In re Ames Department Stores, Inc.*, 121 B.R. 160 (Bankr.S.D.N.Y.1990) ("Westmont"). Citing to the absence of a master agreement, joint advertising, common operating hours, lease clauses providing for termination on assignment of anchor store lease, an operating merchants association and the like, the Debtor contends that Thatcher Woods is no more than a loose collection of stores rather than a shopping center as that term is employed in section 365(b)(3).

In *Westmont,* this Court, after canvassing the extant authorities, ruled that the term "shopping center" is employed in section 365(b)(3) as "contemplating a group of independently owned stores that are contractually interrelated as to the use of store premises contiguous to a common area and thereby planned as a single unit." *Westmont,* 121 B.R. at 164, (citation omitted). While features such as common hours clauses and joint advertising are significant, the presence *vel non* of *inter se* or master lease restraints on use of store premises to sell a competing type of merchandise and radius clauses limiting external competition are Congress' focus in section 365(b)(3). *See* 11 U.S.C. § 365(b)(3)(C).

In the instant matter, generally the smaller stores are limited by use clauses in their leases as to the goods they can sell. Several store leases have radius clauses. The four anchor store leases, except for the Gold Standard Lease regarding use of its premises, contain no such clauses. Inexplicably, three of the anchor stores have the exclusive ability to sell liquor. The Zayre of Illinois Lease partially restricts use of other premises so long as the Lease premises are used as a department store. Presumably, the design was to have four basically unrestricted anchor stores representing national or regional companies and limiting the competition among smaller, more specialized stores.

Admittedly, the issue is close. The lease restraints on use of store premises are only partial. Were this a case involving an assignment of a lease of one of the small stores, it would be clearer that Thatcher Woods is a "shopping center" under section 365(b)(3) given the general restraints on use of smaller store premises. The Debtor notes, to the contrary, the general absence of any of the small store restraints in the Zayre Lease and other anchor tenant leases.

Congress, however, did not employ the term "shopping center" in section 365(b)(3) in a manner indicating that its definition is to be governed the terms of any one lease. It speaks instead of an entity and, as held in *Westmont* and expanded upon in part IV(B) *infra,* Congress left the degree of protection set forth under section 365(b)(3) to be governed by the bargain made by the landlord and tenant. Were it not apparent that the degree of protection is so governed, a different conclusion might be reached. But this approach of first focusing on the entity and than focusing on individual lease to determine the degree of protection recognizes that not all shopping centers are alike and that some, such as in the instant case, may concern partial restraints. Because of the constraints on use of the small store premises and the partial constraints imposed by the Zayre of Illinois Lease on other premises, we conclude that, notwithstanding the absence of restraints on use in the Zayre Lease and the leases of the other anchor tenants, except as noted above, that Thatcher Woods is a "shopping center" under section 365(b)(3) since it passes the threshold physical test and has imposed significant competition restraints on the smaller stores.

**B**

We thus turn to the issue of whether section 365(b)(3)(D), in stating that "assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center," requires that the court disapprove of an assignment that contemplates a change in use of the premises where the subject lease contains no constraints on use.

In contending that section 365(b)(3)(D) requires disapproval, Pioneer asserts that this Court erred in holding, that Congress, in that section, sought only to require bankruptcy courts to enforce legal constraints that are legally cognizable under applicable non-bankruptcy law. It argues that the language of Section 365(b)(3)(D) requires the court to look beyond the terms of the lease where those terms do not afford the landlord with rights to protect the tenant mix at the shopping center.

■ Section 365(b)(3)(D), however, is not to be read in isolation.[5] All of section 365(b)(3) is prefaced by, in the case of an assignment of an executory contract or lease, a clause stating that the various sections exemplify the adequate protection of a lease required under section 365(f)(2). Section 365(f)(2) speaks only of requiring "adequate assurance of future performance ... of such contract or lease" by the assignee, thus referring to the terms of the contract or lease.[6] This reference to the terms of a lease is emphasized by section 365(b)(3) itself in including non-disruption of tenant mix within "adequate assurance of future performance of a lease of real property in a shopping center," 11 U.S.C. § 365(b)(3) (1990), rather than a separate criterion. Accordingly, this Court concluded in the Westmont Decision that "[t]he statute itself thus directs tenant mix inquiry to contractual provisions rather than general notions of tenant mix ...". *Westmont*, 121 B.R. at 165.

Ignoring the structure of section 365(b)(3) and its reference to section 365(f)(2), Pioneer asserts that, since section 365(b)(3)(C) requires an assignment of a shopping center lease be subject to all of the terms of the lease, section 365(b)(3)(D) requires the court to look beyond the terms of the lease. While the argument has some logic to it, it fails to recognize the language of section 365(b)(3) and 365(f)(2) noted above and proceeds on the assumption that failure to so interpret section 365(b)(3)(D) impermissibly nullifies it because section 365(b)(3)(C) refers to the terms of the subject lease. That assumption is erroneous; a likely scenario in which subsection (D) would operate is, for example, in the case where a landlord had sought to protect a bargained for mix of tenants through restraints on assignment reflecting the bargain: *e.g.,* conditioning the right to assign and sublet on non-disruption of tenant mix regardless of the absence of operative exclusivity clauses in the leases of other tenants. To be sure, such a restraint on assignment might be challenged in bankruptcy pursuant to section 365(f)(1)[7] as a constraint on assignment. But, since § 365 is an integrated provision, reading the section as a whole requires consideration of that bargained for right to preserve tenant mix in a shopping center under section 365(b)(3)(D).

Significantly, the legislative history makes plain that Congress' purpose in its

---

5. It is fundamental to statutory construction that each part of a section must be read in connection with other related parts so as to produce a harmonious result. *See, e.g., Richards v. United States,* 369 U.S. 1, 11, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); *Miami Heart Institute v. Sullivan,* 868 F.2d 410, 413 (11th Cir.1989); *Marine Carriers Corp. v. Fowler,* 429 F.2d 702, 706–07 (2d Cir.1970). Accordingly, we must closely examine the interplay among section 365(b)(3)(D), the prefatory language of section 365(b)(3), and section 365(f)(2) so as to avoid an interpretation which dissects one subsection without considering the interrelationship with other subsections. *Accord NLRB v. Lion Oil Co.,* 352 U.S. 282, 288, 77 S.Ct. 330, 1 L.Ed.2d 331 (1957); *Little People's School, Inc. v. United States,* 842 F.2d 570, 573 (1st Cir.1988); *Mrvica v. Esperdy,* 317 F.2d 220, 222 (2d Cir.1963).

6. Section 365(f)(2) provides:

the trustee may assign an executory contract or unexpired lease of the debtor only if—

.     .     .     .     .

(B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract of lease.
11 U.S.C. § 365(f)(2)(B) (1990).

7. Section 365(f)(1) provides that

[e]xcept as provided in subsection (c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.
11 U.S.C. § 365(f)(1) (1990).

1984 tightening up of section 365(b)(3) [8] was to ensure that "the lessor and other tenants [maintain] the benefit of the *original bargain* with the debtor." S.Rep. No. 65, 98th Cong., 1st Sess. 67, 68 (1983) (emphasis added). It sought to eliminate any leeway in changing that bargain. *Id.* Even prior to the amendment, Congress' concern for tenant mix focused on the terms of the lease; *i.e.:* "... whether the business proposed to be conducted would result in a breach of other clauses in master agreements relating, for example, to tenant mix and location." H.R.Rep. No. 595, 95th Cong., 1st Sess. 349 (1977), U.S. Code Cong. & Admin. News 1978, pp. 5787, 6305. Thus, were the statute to be read, as argued by Pioneer, to require the courts to look beyond the terms of the original bargain, such an interpretation is demonstrably at odds with Congress' intention and is not to be followed. *E.g. Federal Deposit Ins. Corp. v. Tremaine*, 133 F.2d 827, 830 (2d Cir.1943) (L. Hand, J.).

Furthermore, interpretation of section 365(b)(3) in a manner consistent with its language and legislative history to refer solely to lease protections and not to general undefined notions of tenant mix is also consistent with a basic precept of bankruptcy law, apart from provisions invalidating certain transfers as fraudulent or preferential:

> Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law. Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving "a windfall merely by reason of the happenstance of bankruptcy." *Lewis v. Manufacturers National Bank*, 364 U.S. 603, 609, 81 S.Ct. 347, 350, 5 L.Ed.2d 323.

*Butner v. United States*, 440 U.S. 48, 54–55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979). *See also In re Lapiana*, 909 F.2d 221, 223, 20 Bankr.Ct.Dec. (LRP) 1391, Bankr.L.Rep. (CCH) ¶ 73,567 (7th Cir.1990) ("It is true of course that bankruptcy, despite its equity pedigree, is a procedure for enforcing prebankruptcy entitlements under specified terms and conditions rather than a flight of redistributive fancy or a grant of freewheeling discretion such as the medieval chancellors enjoyed"); *In re TCI Ltd.*, 769 F.2d 441, 447–48, 13 Collier Bankr.Cas.2d (MB) 299 (7th Cir.1985) ("The bankruptcy court is at all events not authorized to change the law of fixtures or real property in Illinois. It must apply that law and determine the relative entitlements of creditors under it."). For these reasons, state law entitlements are not to be implicitly undermined by "undefined considerations of equity." *Butner*, 440 U.S. at 56, 99 S.Ct. at 918.

Where there is no indication of any intention by Congress to do anything other than hold a shopping center debtor tenant to its bargain with a landlord and to leave intact the property interests of debtor and landlord as set forth in that bargain, the courts should not imply an additional non-bargained-for term. To construe the statute in the manner urged by Pioneer would be "a flight of redistributive fancy," *Lapiana*, 909 F.2d at 223, affording the landlord of a shopping center with "a windfall merely by reason of the happenstance of bankruptcy" condemned by the *Butner* Court. *Butner*, 440 U.S. at 55, 99 S.Ct. at 918.

Here, the Lease permits the premises to be used for any purpose. It also permits the premises to be partially sublet for any purpose. Nothing in the Lease or the record before the Court indicates that the Landlord bargained for the right to preserve tenant mix. Under paragraph 17 of the Lease, Zayre Illinois or Zayre Corp. or the original tenant, could have sublet to Schottenstein the same portion of the store that Schottenstein desires to use as a furniture store or set up its own furniture store and sub-let the remainder of the premises

---

**8.** *See* Westmont Decision at 10–11 n. 4.

without any legally tenable objection by Pioneer under applicable non-bankruptcy law. Thus, paragraph 17's bar of assignments to non-affiliates cannot be said to have been designed to preserve tenant mix. With Pioneer not having legally protected itself from a change in tenant mix,[9] no reason exists why it should have such a right now that Zayre Illinois has filed for bankruptcy.

With none of the other requirements of section 365 of the Bankruptcy Code being disputed, an order is to be entered granting the motion by Zayre Illinois to assume the Lease and to assign the Lease to Schottenstein. Settle Order.

---

**9.** Although Thatcher Woods was originally planned, according to Pioneer, to carefully preserve tenant mix among the four anchor stores, Pioneer apparently sanctioned a change in tenant mix from two supermarkets to one in permitting a liquor store to take over the National Tea premises.