**In re SERVICE MERCHANDISE COMPANY, INC., et al., Debtors.**

**No. 399–02649.**

United States Bankruptcy Court, M.D. Tennessee.

Aug. 29, 2002.

---

John M. Butler, George Panagakis, Marian Wexler, Patrick Nash, Skadden Arps, Slate, Meagher & Flom, Chicago, IL, Paul G. Jennings, Beth A. Dunning, Bass, Berry & Sims, Nashville, TN, for the Debtors.

Neil Herman, Morgan, Lewis & Bockins, LLP, New York, NY, for JLPK Novi, LLC.

Ian I. Allen, Ramco–Gershenson, Managing Entity for Ramco–Gershenson Properties, L.P., Paul S. Magy, Matthew W. Schlegel, Kupelian Ormond & Magy, Southfield, MI, Gail Reece, Nashville, TN, for Ramco Gershenson Properties, L.P.

Beth R. Derrick, Assistant United States Trustee, Nashville, TN, for the United States Trustee.

## MEMORANDUM

GEORGE C. PAINE, II, Chief Judge.

This matter is before the court on the objections of Ramco–Gershenson Properties, L.P. (hereinafter "Ramco" or "landlord") to Service Merchandise Company, Inc.'s (hereinafter "debtors") notice regarding the proposed assignment of its lease for store number 533 in Novi, Michigan. Generally, Ramco argues that the debtor cannot make the proposed assignment to JLPK–Novi, LLC (hereinafter "JLPK") because it has failed to establish pursuant to 11 U.S.C. § 365(b)(3) and (f) adequate assurance of future performance by the proposed assignee ("JLPK") concerning financial and operating performance, use restrictions, and tenant mix.

Furthermore, Ramco asserts that the debtor's proposed assignment was without the landlord's consent as is required by the lease terms, and therefore, Ramco's option to purchase has been triggered under the lease. Finally, if the assignment to JLPK is approved, Ramco objects to any proposed sublease to Michaels Stores, Inc. (hereinafter "Michaels"), or this court's approval of such. For the reasons hereinafter explained, the court overrules Ramco's objections, and approves the assignment of the Novi lease to JLPK; finds that Ramco cannot reasonably withhold its consent to the Michaels' sublease, and finds the "going dark" provision in the Novi lease enforceable to the extent limited herein.

## FINDINGS OF FACT

In 1980, the debtors entered into a lease with Ramco for approximately 60,000 square feet of retail space in West Oaks I Shopping Center in Novi, Michigan. The debtors filed for chapter 11 bankruptcy protection in March, 1999. In February of 2001, the debtors assumed this lease, including all obligations contained therein, and sublet approximately one-half of the square footage to the TJX Companies, Inc ("TJX") pursuant to the landlord's consent under a Third Amendment to the Lease. The debtor expressly ratified all terms and provisions of the lease, and the Third Amendment to the Lease.

On February 15, 2002, debtors filed a motion seeking authority to sell certain Designation Rights with respect to substantially all of the debtors' real estate assets, including leasehold interests, to KLA/SM, L.L.C. Ramco objected to the debtors' motion, and pursuant to a written stipulation, the parties resolved those objections. The stipulation provided that the lease terms were ratified but that each party retained its rights to object at a later time pursuant to 11 U.S.C. 365 upon an attempted assignment, and the debtors retained rights to object to lease terms as anti-assignment provisions. On March 15, 2002, the order approving the sale of Designation Rights to KLA/SM, L.L.C was entered in conjunction with the above Stipulation.

On April 25, 2002, debtors issued a Lease Notice whereby Ramco was notified that the debtors proposed to assign the Novi lease to JLPK, which in turn proposed to sublease to Michaels. On April 26, 2002, Ramco responded stating that it was withholding its consent, which is required under the lease and Third Amendment to the Lease, to the proposed assignment and sublease. Further, Ramco notified the debtors that it was exercising its purchase rights under the previously ratified terms of the parties' lease. On May 10, 2002, Ramco filed this objection with the court, and simultaneously therewith, an adversary seeking enforcement of its purchase rights.

It is Ramco's position that they reasonably withheld their consent to allow the proposed assignment in that the debtors failed to adequately assure Ramco of JLPK and/or Michaels future performance. Furthermore, Ramco contends that it reasonably withheld consent on the sublease and is therefore permitted to exercise its purchase option, thereby preventing any eventual sublease to Michaels.

## DISCUSSION

Against this general factual background, Ramco, JLPK, and the debtors ask this court to decide:

1. Is the lease provision permitting Ramco to purchase the debtor's leasehold interest upon denial of its reasonably withheld consent an anti-assignment provision that is unenforceable within the confines of bankruptcy?

**Ruling:** The court ruled at the August 13–15 hearing that the purchase option is indeed a restriction on assignment in contravention of section 365(f). Accordingly, Ramco has no option to purchase the lease because of the assignment to JLPK.

2. Has the debtor carried its burden to establish adequate assurance of future performance to assign the lease to JLPK?

**Ruling:** The debtor has met its burden and shown to this court adequate assurance of future performance with respect to (1) financial strength and operating performance of JLPK; (2)use and exclusivity issues and (3) tenant mix issues

3. Was consent reasonably withheld by the landlord for the sublease from JLPK to Michael's Inc. thereby permitting Ramco to exercise its purchase option under the terms of the overlease?

**Ruling:** The court finds that consent was unreasonably withheld by Ramco, and furthermore that the sublease between JLPK and Michaels is approved.

4. Does the "going dark" provision in the Novi lease allow Ramco to exercise its purchase option?

**Ruling:** The court finds that the "going dark" provision is enforceable, provided however, that the nine month "going dark" period begins to run upon assignment to JLPK.

### A. Anti–Assignment Issues

The Novi lease contained the following provision:

**Section 31. Assignment and Subletting**

In the event Landlord withholds consent to any such assignment or sublet and Tenant desires to proceed with any such assignment or sublet, Tenant shall have the right to do so, if, within ninety (90) days after Tenant notified landlord it desires to proceed, Landlord does not notify Tenant that Landlord elects to purchase Tenant's leasehold interest. In the event Landlord elects to purchase, such interest the purchase price therefor and the manner of acquiring same shall be as provided in Section 10 hereof.

**Section 10. Use of Premises**

. . . The purchase price for such leasehold improvements shall be greater of (i) unpaid balance of Tenant's mortgage plus any prepayment penalty (ii) unamortized cost of Tenant's leasehold improvements, or (iii) fair market value of the building and improvements occupied by Tenant on the leased premises as determined by . . .

The court ruled at the August 13–15, 2002 hearing that this provision was in fact an anti-assignment provision, and therefore unenforceable within the bankruptcy context. Although not specifically addressed in the court's ruling, implicit therein, is the court's finding that the landlord's failure to consent to the assignment does not prevent the assignment. The only issue left open at the conclusion of the court's ruling was whether the lease provision allowing purchase upon reasonably withheld consent was also an anti-assignment provision for purposes of the proposed sublease to Michael's Inc. The court reserved ruling on that issue, and that is more fully discussed in section B herein.

### B. Adequate Assurance of Future Performance

Section 365(b)(3) imposes a heightened standard for "adequate assurance of future performance" in shopping center leases. That standard requires adequate assurance:

(A) of the source of rent and other consideration due under such lease, and in the case of an assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the lease;

(B) that any percentage rent due under such lease will not decline substantially;

(C) that assumption or assignment of such lease is subject to all the provisions thereof, including (but not limited to) provisions such as a radius, location, use, or exclusivity provision, and will not breach any such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center; and

(D) that assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center.

11 U.S.C. §§ 365(b)(3). The objections raised by Ramco under this Code section relates to 365(b)(3)(A), (C) and (D).

### 1. Section 365(b)(3)(A)

 In order to meet the burden under section 365(b)(3)(A), the debtor must establish that the financial condition and operating performance of JLPK are similar to the debtors' at the time of lease signing. The statute's prime purpose is to provide adequate assurance for the payment of future rent. *In re Casual Male Corp.*, 120 B.R. 256 (Bankr.D.Mass.1990).

This burden has clearly been met in this case both with respect to financial and operating performance.

Although JLPK–Novi, L.L.C. is a newly formed entity, this does not prevent the court from assessing its financial and operating performance. Section 365(b) requires that the debtor provide adequate assurance of "future performance." In this case, the assignee's future performance is to be judged, *inter alia,* by the financial strength of its backers, and its operating performance is to be judged by its principal's operating performance. *See In re Casual Male Corp.*, 120 B.R. 256 (Bankr.D.Mass.1990) ("Because MY was recently incorporated, any judgment concerning the strength of its operating performance necessarily depends upon the business experience of York, its sole owner and chief executive officer.").

### a) Adequate Assurance of Financial Strength

When the original lease was signed between the debtors and Ramco, Service Merchandise's 1980 Annual Report showed that it operated about 115 stores enjoyed approximately $400 million in assets and about $121 million in shareholders equity. *See* Exhibit D13. JLPK must meet or exceed this financial position in order to demonstrate adequate assurance of future financial performance under section 365(b) of the Bankruptcy Code. JLPK's proof of its financial strength was more than sufficient to show it is at least as strong as the

debtors in 1980 based upon, among other things, the following [1]:

a) JLPK has a projected cash flow from the Novi location of over $600,000 annually. TJX as a subtenant has annual rent of $292,668.00. The annual rent under the proposed Michael's sublease is $408,811.00. After deducting $45,000 per lease for the annual rent payable to the landlord on the debtors' overlease, there is approximately $606,000 per year in excess of annual sublease rent. *See* Exhibit D6. The TJX rent alone is more than two times the current rent on the debtors' overlease. Furthermore, the uncontroverted proof was that the revenue stream of JLPK has not been pledged to any other creditor and is available to satisfy claims of Ramco. *See In re Sapolin Paints, Inc.*, 5 B.R. 412, 421 (Bankr.E.D.N.Y. 1980) (market rental rate three-times higher than the ease rate regarded as adequate assurance allowing assumption under § 365(b)).

b) JLPK's members,[2] Jubilee L.P, and KimSchott, Inc. are wholly owned by Schottenstein Stores Corp. (hereinafter "Schottenstein") and Kimco Realty Corp. (hereinafter "Kimco"), the parent companies of JLPK. Kimco has assets in the approximate amount of $3.4 billion dollars and shareholders equity of $1.9 billion. Schottenstein has assets in excess of $1 billion and shareholders equity of approximately $400,000 million. *See* Exhibit D8 and D9. In addition, both Kimco and Schottenstein have extensive retail holdings and extensive retail experience.[3]

c) Kimco and Schottenstein both provided absolute guarantees to Ramco for

**1.** The entities involved in the JLPK–Novi, LLC were summarized as follows by Exhibit D1:

**Schottenstein Stores Corp.**
**100%** *
*

**Kimco Realty Corporation**
* **100%**
*

**Jubilee Limited Partnership**
**57.5%** *
*

**KimSchott, Inc.**
* **42.5%**
*

* *

**JLPK-Novi LLC**

**2.** The LLC is a form of legal entity that has attributes of both a corporation and a partnership but is not formally characterized as either one. Generally, an LLC offers all of its members, including any member-manager, limited liability as if they were shareholders of a corporation but treats the entity and its quate assurance of future performance.members as a partnership for tax purposes. *See*

*ICLNDS Notes Acquisition, LLC*, 259 B.R. 289 (Bankr.N.D.Ohio, 2001) (quoting *Thomas F. Blakemore, Limited Liability Companies and the Bankruptcy Code: A Technical Overview*, 13 Am. Bankr.Inst. J. 12 (1994)).

**3.** *See infra* pages 684–685, discussion relating to operating performance to provide adequate assurance of future performance.

one year of rent following any default. Both Kimco and Schottenstein have signed, absolute guarantees, limited to one year's fixed rent, not to exceed $96,063.84. The guarantee, according to Mr. Jeffrey S. Gould's testimony, was limited to one year, because that was the outside time it would take to re-let the space in the event of a JLPK default. *See* Exhibit D7.

d) The debtors' original subtenant, TJX, also signed a "Recognition Agreement" with Ramco that provides that in the event of a Service Merchandise (or its assignee's) default, TJX will pay all rents owed directly to Ramco and that TJX's assets would be available to satisfy that obligation. The uncontroverted proof shows TJX operates over 1000 stores, has shareholder's equity of approximately $1.4 billion and assets of over $3.3 billion. Because TJX's sublease provides rental payments over two times the debtor's entire overlease, this is a substantial protection to Ramco in the event of a JLPK default. In addition to this assurance, however, Michaels has offered a "Recognition Agreement" to Ramco as well. Michaels has agreed that in the event of JLPK's default, it would step-up in privity with the landlord and make all rental payments directly to Ramco in exchange for Ramco's nondisturbance agreement in the event of loss or termination of the overlease. *See* Exhibit D11. If Ramco were to accept this offer of assurance by Michaels, it would also have Michaels' assets at its disposal in the event of a Michaels' default. The proof establishes Michaels assets to be about $1.4 billion and shareholders equity of approximately $824 million, both of which have increased every year from 1997 until 2001.

All of these factors indicate strong, financial health on the part of JLPK, and provide Ramco with ample assurance of future performance by JLPK. Furthermore, each guarantor alone has more secure financial standing than Service Merchandise in 1980, and together their financial strength is nothing short of impressive, and certainly adequate assurance of JLPK's future performance.

### b) Adequate Assurance of Operating Performance

Because JLPK is a newly formed entity, its operating performance is obviously non-existent, but contrary to Ramco's assertions, this does not prevent assumption of the lease. As noted by the court in the *Casual Male Corp.* case, "any judgment concerning the strength of [the newly formed entity's] operating performance necessarily depends upon the business experience of [its] sole owner and chief executive officer." *In re Casual Male Corp.*, 120 B.R. at 265. Service Merchandise Company, Inc. operated approximately 115 stores in 25 states in 1980 (leasing signing), and was the second-largest catalog showroom merchandiser. The company sold jewelry, diamonds, brand-name hardgoods such as housewares, small appliances, giftwares, silverware, cameras, luggage, radios, televisions, some electronics, toys and sporting goods. JLPK's operations must prove similar to the debtors as of 1980.

To make that assessment, the court looks to the operating performance of Schottenstein, Kimco, TJX and Michaels. A review of these entities proves that Ramco has been adequately assured of future operating performance by JLPK:

a) **Schottenstein Stores Corporation** has annual revenues in excess of $3 bil-

lion and holds, manages or otherwise controls over 16 million square feet of commercial and residential properties. Schottenstein Stores Corporation is comprised of:

(1) **Value City Department Stores** (115 stores in 15 states with over $1 billion in annual sales; a leader in off-price department stores);

(2) **Filene's Basement** (21 stores in the northeast and midwest, bought out of bankruptcy in 2000 by Value City specializing in off-price clothing);

(3) **DSW Shoe Warehouse** (104 locations in more than 50 U.S. markets, selling shoes at bargain prices);

(4) **Value City Furniture** (77 superstores in 15 states employing more than 5,000 employees specializing in home furnishings);

(5) **American Eagle Outfitters** (677 stores in 47 states and Canada, a clothing retailer with annual sales in excess of $1 billion);

(6) **Schottenstein Management Company** (a management company offering development, construction, leasing, management and acquisition services for turnaround situations and otherwise); and

(7) **SB Capital Group** (advising clients on turnaround strategies, providing asset valuation services, financial assistance in restructuring and other asset management services).

b) **Kimco Realty Corp.,** operating as a real estate investment trust (REIT) is the largest publically traded owner and operator of neighborhood and community shopping centers in North America. They own or manage shopping centers in over 45 states, and own or manage approximately 72,609,897 of GLA (gross leasable area). It has been traded for over 10 year as a public company and has been in the retail business for over 40 years. In addition to its shopping center interests, Kimco has several operating businesses including: Kimco Developers, Inc. (merchant building), Retail Properties Solutions (capital and consulting for retailers); Kimco Select Investments (secondary market investments in real estate and retail related securities); Kimco Preferred Equity (strategic financing for acquisitions of shopping centers); and Kimco Exchange Place (facilitating 1031 exchanges of real estate).

c) **TJX Companies, Inc.** is a leading off-price retailer in apparel and home fashions. TJX operates 1,426 stores worldwide, employing approximately 89,-000 employees (including part-time employees) with total assets in excess of $3.3 billion and shareholder equity 1.4 billion. TJX has the following entities:

(1) **T.J. Maxx:** 687 stores in 47 states. Also has 101 stores in the United Kingdom and Ireland (called T.K Maxx) averaging approximately 26,000 square feet per store. A leading off-price retailer of department store inventory offering family apparel, accessories, giftware and domestics. T.J. Maxx also offers shoes and fine jewelry and Marshalls has a full shoe line and larger menswear selection. Both operating with a common buying and merchandising organization and target the middle to upper-middle income shopper.

(2) **Marshalls:** 568 Marshalls stores in 40 states and 14 stores in Puerto Rico.

(3) **Winners:** leading off-price retailer in Canada for women's apparel and shoes, accessories, lingerie, domestics, giftware, menswear and children's clothing. There are 131 stores (approximately 28,000 square feet per store).

**(4) Homegoods:** an off-price retailer focusing on the home fashion market offering giftware, accent furniture, lamps, rugs, accessories and seasonal merchandise for the home. Some Homegoods stores are combined with T.J. Maxx (called T.J. Maxx 'N More) or Marshalls (Marshalls Mega–Store). Stand alone Homegoods Store average about 29,000 square feet. Of the 112 stores involving Homegoods, 71 are stand-alone stores and 41 are superstores.

**(5) A.J. Wright:** a newer chain, launched in 1999 targeting off-price shopping to the moderate income shopper for branded family apparel, accessories, shoes, domestics, and giftware. There are currently approximately 45 stores in about 12 states.

**d) Michaels Stores Inc.** is the nations largest speciality retailer of arts and crafts merchandise. There are 835 stores in 48 states and Canada. Total assets in 2001 were $950,000,000 and shareholders equity was over $824,500,000. Michaels Stores Inc. has the following operations ongoing [4]:

**(1) Michaels Stores:** 695 stores in 48 states and Canada. Stores average about $3.7 million in sales and are about 18,100 square feet in size. They carry arts and crafts merchandise, framing, floral, wall decor and seasonal products.

**(2) Aaron Brothers:** 139 stores in eight states offering ready-made frames, and mats for do-it-yourself framing, professional framing and art supplies for students and professionals. The stores average 5,900 square feet and generate about $1.1 million in sales.

**(3) Aristree:** a vertically integrated frame and moulding manufacturing operation in North Carolina, Texas and California. These locations support Michaels and Aaron Brothers and handle custom framing. Michaels, Aaron Brothers and Aristree together handle more frame orders than anyone in the world.

**(4) Star Decorators Wholesale Warehouse:** located in Dallas, Texas is a wholesaler catering to interior decorators, designers and party event planners.

Given the extensive operating history and performance of these relevant entities, any of which alone is equivalent to Service Merchandise in 1980, the court finds that adequate assurance of future operating performance has likewise been shown by JLPK. Even if only the operating history and performances of Schottenstein and Kimco alone (as the parent companies of JLPK) were relevant, there is no question that a reasonable landlord would be adequately assured of future operating performance and that Ramco in this instance is adequately assured.

### 2. Section 365(b)(3)(C)

■ Section 365(b)(3)(C) requires:

that the assumption or assignment of such lease is subject to all the provisions thereof, including (but not limited to) provisions such as a radius, location, use, or exclusivity provision, and will not breach any such provision contained in any lease, financing agreement, or master agreement relating to such shopping center;

11 U.S.C. § 365(b)(3)(C) (2002). Ramco contends that JLPK's proposed sublease of

---

**4.** Michaels Stores Inc. also operates five distribution centers in California (2), Florida, and Kentucky.

the premises to Michaels would violate section 365(b)(3)(C) because within the West Oaks II shopping center is one of Michaels' chief competitors: Jo–Ann's Stores, Inc. (hereinafter "Jo–Ann's"). Specifically, a sublease to Michaels, according to Ramco, would violate the protected use provisions in Ramco's lease with Jo–Ann's.[5] The intended use under the Michaels sublease is as follows:

> [S]torage (in support of retail operations on the Property), service and retail sale of arts, crafts and related supplies; fabrics and notions; floral supplies and arrangements; hobby, needlework, and home decor items and supplies; party, wedding and seasonal decorations; picture frames and framing services and supplies; wearable art and supplies; and such other merchandise as is typically found in other stores operated by Michaels Stores, Inc. and such other uses as comply with the terms of the Lease.

The use provision in the Jo–Ann's lease provides that permitted use shall mean:

> the sale of fabrics of all kinds, yard goods, linens, curtain, upholstery materials, towels draperies, drapery hardware, patterns, knitting supplies, needlepoint, macrame, art materials and supplies, craft materials and supplies, wearable art and wearable art supplies, miniature dolls, hoboy items, framing, bridal apparel and accessories, wedding supplies, floral products, artificial flowers and accessories, gift items, cards, party supplies, paper goods, stationary, candles, candlesticks, foam products, yarns, all types of notions, indoor and outdoor house decorating products and accessories, furniture, do-it-yourself craft products and accessories, seasonal merchandise (as it relates to the time of the year or the upcoming holiday), housewares, incidental sale of food and food products, incidental sale of coffee, tea and assorted beverages, instructional books and tapes, children's books, toys, sewing machines, sewing machine furniture, vacuum cleaners, fabric care items, picture frames and framing materials and supplies, custom services including, but not limited to, quilting, bowmaking, window treatments, floral design, alterations, and framing, instructional classes, materials and services, products, accessories related to all of the foregoing, the operation of a coffee shop (not to exceed five hundred (500) square feet), and other items and services customarily offered for sale by a fabric and/or arts and crafts store, and such other related merchandise and services typically offered in a majority of the stores operated by Tenant under the name Jo–Ann etc or Jo–Ann Fabrics and Crafts.

JLPK argues that not only is the use of the Service Merchandise space beyond the landlord's control under the Service Merchandise lease, but also Service Merchandise's lease is "carved out" as an exception to the protected use provisions in the Jo–Ann's lease. According to JLPK, not only is the landlord not permitted to control use of the Service Merchandise space, it is not

---

5. Jo–Ann's recently leased approximately 49,-000 square feet in a custom-built two-story space. The Jo–Ann's lease contained the following exclusive use provision:

> (n) "Protected Use" shall mean the sale of fabric of all kinds, yard goods, upholstery materials, patterns, knitting supplies, needlepoint, macrame, artificial flowers and accessories, arts and crafts materials and supplies, yarns, all types of fabric, sewing and arts and crafts notions, sewing machine furniture.

In the event of violation of the protected use clause, Jo–Ann's has the right to either: a) reduce its monthly rental payments from the $49,675 specified in the lease to $5,000 per month, or, b) terminate the lease.

obligated to lobby on Jo–Ann's behalf to prevent the Michaels sublease because the landlord does not control the use of the Service Merchandise space.

The Service Merchandise lease with Ramco was executed May 27, 1980, and contains the following provision concerning "Use of the Premises":

Tenant shall initially open the leased premises for the operation of a typical catalog store operated by Tenant under the name "Service Merchandise." Thereafter, Tenant may use the leased premises *for any lawful retail purpose;* provided, however, that so long as the remainder of the Shopping Center is being used and operated as a first-class, retail/commercial development, such use must be consistent with the use of the remainder of the Shopping Center as a first-class, retail/commercial development. This provision shall not be construed as imposing an obligation on Tenant to operated in any manner.

**Service Merchandise Lease, dated May 27, 1980 (emphasis added).** Under this specific provision, the debtors are free to use this space for "any lawful retail purpose" without consent of the landlord, and irrespective of other tenant leases. There was absolutely no proof provided to this court that this lease provision has been restricted or otherwise changed by any subsequent agreement, Reciprocal Basement Agreement, master lease, or otherwise. The clear, plain-meaning interpretation of this lease provision entitles Service Merchandise to use their retail space, and therefore JLPK to use this retail space, for "any lawful retail purpose" including use as a Michaels. This use provision is beyond the landlord's control, so long as it is for a "lawful retail purpose."

Ramco argues that it will suffer substantial damages if a Michaels is allowed in the Service Merchandise space by virtue of Section 14 of Ramco's lease with Jo–Ann's. That provision provides:

*SECTION 14.* (a) In the event that any portion of the Shopping Center other than the Premises, or any outparcel *owned or where the particular use thereof is controlled by Landlord,* or any additions to the Shopping Center owned or where the particular use thereof is controlled by Landlord, or any portion of the shopping center designated as "West Oaks I" on Exhibit "B–1" attached hereto is owner or operated by Landlord or Landlord affiliate, are used or occupied for the Protected Use or if any sales area therein is designated for the Protected Use (either of the foregoing being referred to as a "Market Condition"), then so long as Tenant is not in default of this Lease beyond any applicable cure period, then Tenant shall have the right and option, so long as Tenant is leasing at least forty thousand (40,000) square feet of space of the Shopping Center and continues to use the Premises primarily for the use set forth as a Protected Use, then after notifying Landlord of such violation and Landlord fails, within thirty (30) days of notice of such violation (provided, however, such thirty (30) day period may be extended should Landlord have commenced legal action against such party and continues to diligently pursue legal action against such party forcing them to permanently cease violating such Market Condition), to cure such violation of such Market Condition, then Tenant shall have the right and option to either to (i) pay as substitute rent only an amount equal to Five Thousand and No/100 Dollars ($5,000.00) per month, in lieu of the Fixed Minimum Rent and Percentage Rent required to be paid hereunder (hereinafter referred to as "Substitute Rent"), or (ii) terminate this

Lease by giving written notice to Landlord . . .

**Jo–Ann's Lease, dated March 19, 1999, Section 14 (emphasis added).** Ramco does not own or control the use of the Service Merchandise lease. That is clear by the "Use of the Premises" section of Service Merchandise's lease, and by the plain meaning interpretation of that provision. Service Merchandise, and therefore its assignee, are permitted to use that space for any lawful retail purpose, including as a Michaels, and Ramco's obligation to Jo–Ann's to prohibit "protected use" activities under the Jo–Ann's lease, is not triggered because it does not own or control the use of the Service Merchandise space.

The court is unable to find any "use" or "exclusive" restrictions that would prohibit JLPK as an assignee of the Service Merchandise lease. JLPK's intention to simultaneously sublease to Michaels does not impinge upon any use provisions or exclusivity restrictions, and therefore the burden has been met pursuant to 11 U.S.C. § 365(b)(3)(C) to show JLPK's adequate assurance of future performance.[6]

### 3. Section 365(b)(3)(D)

 Lastly, as to the proposed assignment Ramco argues that tenant mix would be disrupted if the Michaels sublease proceeds. Section 365(b)(3)(D) provides:

that assumption or assignment of such lease will not disrupt any tenant mix or balance in the shopping center.

11 U.S.C. § 365(b)(3)(D) (2002). Although tenant mix and balance are not statutorily defined, it has been held that the court's inquiry is not directed by general notions

---

**6.** The court heard extensive testimony and received voluminous documentary evidence concerning whether West Oaks Shopping Center was one shopping center or two shopping centers (West Oaks I and West Oaks II). This issue appeared relevant as to use issues if somehow the Service Merchandise space was limited under the Jo–Ann's lease. This court has found that the use of the Service Merchandise space is not controlled by the landlord and furthermore was not limited by the Jo–Ann's lease. This finding appears to moot any issue of whether West Oaks is one shopping center or two.

However, out of an abundance of caution, the court finds that West Oaks I and West Oaks II are in fact two shopping centers based, *inter alia,* upon the factors listed below. A finding of two shopping centers could somehow be relevant to tenant mix issues pursuant to 11 U.S.C. § 365(b)(3)(D), but is irrelevant to exclusive provisions in the Jo–Ann's lease in light of this court's finding that the permitted use of the Service Merchandise space is not within Ramco's control.

Factors the court considered in finding that West Oaks I and West Oaks II are separate shopping centers included:
- West Oaks I and West Oaks II are separated by a major public road.
- West Oaks I and West Oaks II file separate annual reports, and separate financial statements.
- Common Area Maintenance Charges are separate for West Oaks I and West Oaks II.
- West Oaks I and West Oaks II do not share any common walls or roofs and there is no over or under pass across West Oaks Drive to ambulate conveniently between the two.
- "Shopping Center" in the Jo–Ann's lease is defined as "the West Oaks II" located at 43570 West Oaks Drive, Novi, Michigan, 48377 consisting of all buildings including the Premises and Common Areas, and other improvements located upon the Shopping Center Site, but shall exclude any property on the Shopping Center site not owned by the Landlord.
- The Jo–Ann's lease makes specific references to "West Oaks I" when that shopping center is to be included. *See e.g.,* Section 14 discussing Market Condition.
- The Third Amendment to the (Service Merchandise Lease), executed in December, 2000 refers to the "retail shopping center commonly known as 'West Oaks I.' "

of tenant mix. *See In re Ames Department Stores,* 121 B.R. 160, 165 (Bankr. S.D.N.Y.1990) ("The statute itself thus directs tenant mix inquiry to contractual provisions rather than general notions of tenant mix . . . ."). What § 365(b)(3) requires is that "a shopping center tenant [be held] to its bargain with a landlord and to leave intact the property interests of debtor and landlord as set forth in that bargain, the courts should not imply an additional non-bargained-for-term." *In re Ames Department Stores, Inc.,* 127 B.R. 744, 753 (Bankr.S.D.N.Y.1991). Section 365(b)(3)(D), which merely implements section 365(f)(2) in a shopping center context, does not require protections unrelated to or outside performance of the actual lease in question. *Id.* This subsection is protection for the landlord, not other shopping center tenants.

 In this case, there do not appear to be any issues of tenant mix and balance that would prevent the court from allowing the proposed assignment to JLPK with an intended sublease to Michaels. Although Michaels and Jo–Ann's are competitors with respect to certain common inventory items, Michaels is the type of tenant that would fit consistently within West Oaks I as a favorable tenant, and would not disrupt tenant mix and balance of West Oaks II. Even if West Oaks I and West Oaks II were considered the same shopping center, the court would not find that tenant mix and balance would be so disrupted as to prevent the assignment to JLPK while it intends Michaels as an enduser. This is especially true because Ramco abdicated control of the use of the Service Merchandise space in its original lease negotiations. Neither Ramco, nor the other West Oaks I and West Oaks II tenants should be afforded greater protections within bankruptcy than were available outside bankruptcy. *See In re Lafayette Radio Electronics, Corp.,* 9 B.R. 993,

998 (Bankr.E.D.N.Y.1981) ("landlord cannot be granted any greater rights than what the lease provides.").

### 4. Conclusions as to Assignment Issues

The court finds that JLPK has amply demonstrated adequate assurance of future performance as to financial strength, operating performance, use and exclusive provisions and tenant mix as specifically objected to by Ramco. The court finds that Ramco's consent to the assignment is either deemed to occur by this court's ruling or is otherwise unenforceable as an anti-assignment provision. However, to the extent that Ramco's consent is required, having found all elements of sections 365(b)(3) and (f) met, the court finds that Ramco could not reasonably withhold its consent to the JLPK assignment. Accordingly, the court overrules all Ramco objections to the proposed assignment of the Novi lease to JLPK, and approves that assignment.

### C. Reasonably Withheld Consent to the Sublease & Going Dark Provisions

The court took under advisement the specific issues of whether the consent (and therefore purchase option) in the Service Merchandise lease was excised for purposes of assignment or for purposes of both the assignment *and* sublease to Michaels. Likewise, the court withheld a ruling on whether the "going dark" provision in the Service Merchandise lease would trigger the landlord's purchase rights if the sublease proceeded and were violated. For the reasons explained herein, the court finds that no valid, business justification for Ramco to withhold its consent to the sublease. As to the going dark provision, the court finds that the provision bargained for by the parties provides for a

nine (9) month going dark period, and this provision cannot be removed by the court simply because it is unfavorable to a proposed subtenant.

### 1. Reasonably Withheld Consent

 Ramco contends that its' consent to the sublease has been reasonably withheld, and therefore its purchase option is triggered. A large part of its reasoning was based upon its perceived need to protect the exclusive provisions contained in the Jo–Ann's lease. In light of this court's ruling that Jo–Ann's exclusive provision does not prevent Michaels from subletting the Service Merchandise space, that is no longer a valid business justification for withholding consent.

Ramco's rejection should be "judged under a test applying a reasonable commercial standard." [7] Courts have generally construed such factors as: (1) the subtenant's financial responsibility, (2) the type of business to be conducted on the premises, and (3) whether the business competes with that of the lessor or another lessee.[8]

 As this court has held previously, reasonable commercial standards is different verbiage, at least in this instance, for the exercise of Ramco's best business judgment in accordance with the specific terms of this lease. *Cermak v. Service Merchandise Co., Inc.*, Case No. 99–02649, Adversary No. 00–0361A, Adversary Docket No. 26 (Mar. 12, 2001). Under the business judgment rule, Ramco must articulate a valid, business justification, acting in good faith to deny its consent to the Michaels' sublease. *Id.* The problem Ramco cannot overcome in this case is that it cannot produce a *valid* business justification to withhold consent.[9] The landlord's only articulated justification is the economic windfall that would result from regain-

---

7. The lease provides that Michigan law applies. However, no authority was directly on point from that jurisdiction. *See e.g., Homa–Goff Interiors, Inc. v. Cowden*, 350 So.2d 1035, 1038 (Ala.1977); *Cohen v. Ratinoff*, 147 Cal.App.3d 321, 195 Cal.Rptr. 84 (1983) (that a lessor may refuse consent to an assignment or sublease only when the lessor has a good faith reasonable objection to it). *See Commissioner v. Estate of Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967); *Estrella v. Brandt*, 682 F.2d 814, 818 (9th Cir.1982); *Golf Management Co., Inc. v. Evening Tides Waterbeds*, 213 Ill.App.3d 355, 157 Ill.Dec. 536, 572 N.E.2d 1000, 1003 (1991)(To prove that its landlord unreasonably refused to consent to a sublease, a tenant must prove that it tendered a subtenant who was "ready, willing, and able to take over the lease and who, at the very least, met reasonable commercial standards."); *B.M.B. Corp. v. McMahan's Valley Stores*, 869 F.2d 865 (5th Cir.1989) ("Commercial reasonableness thus is determined by reference to the provisions negotiated in the original lease between the landlord and tenant, not by reference to what the landlord later finds most economically advantageous."); *F.H.R. Auto Sales v. Scutti*, 144 A.D.2d 956, 534 N.Y.S.2d 266 (1988) (where a

landlord affirmatively promises not to unreasonably withhold its consent, its refusal can only be based upon a consideration of objective factors, such as the financial responsibility of the subtenant, the subtenant's suitability for the particular building, the legality of the proposed use and the nature of the occupancy, i.e., office, factory, retail); *Vranas & Assocs. v. Family Pride Finer Foods, Inc.*, 147 Ill.App.3d 995, 101 Ill.Dec. 151, 498 N.E.2d 333 (1986) (Commercially reasonable standards may include the financial responsibility of the proposed subtenant, the type of business to be conducted, and whether it competes with the business of the lessor or other tenants).

8. *See Vranas & Assocs. v. Family Pride Finer Foods, Inc.*, 147 Ill.App.3d 995, 101 Ill.Dec. 151, 498 N.E.2d 333, 339 (1986)

9. As the court has already ruled, defending the exclusive provision in the Jo–Ann's lease to prevent Jo–Ann's from either reducing the monthly rent or terminating the lease is not a valid business justification in light of this court's ruling that Ramco has no control over the use of the Service Merchandise space.

ing control over a space with below-market rents, or to regain control over the use of the space. Neither of these are valid justifications.

Ramco will enjoy a financially strong tenant with incredible assurances in the event of a JLPK default. Further, the testimony affirmed that Michaels is the type of business that will compliment other tenants and targets similar customers consistent with overall shopping center goals. While Ramco does have some reservations about Michaels competing with Jo–Ann's that consideration does not provide a basis for withholding consent because the landlord does not control the "use" of the Service Merchandise space.

Landlords have the right to control the uses to which their property may be put and where a lease expressly limits and restricts the use of property to a specific purpose, such provision will be given effect. However, this principle does not necessarily apply with equal force to covenants seeking to limit the right to assign or sublet since such covenants are restraints on the free alienation of land which courts do not favor. *See, e.g., Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 412 N.Y.S.2d 827, 385 N.E.2d 566 (1978). And in this case, the landlord's desire to "control" the Service Merchandise space should be given even less force since Ramco specifically contracted away control over the space by allowing the space to be operated "for any lawful retail purpose."

 The lease must be interpreted as a whole, so as to give each of its provisions the meaning intended by the parties. *Leon v. Detroit Harvester Co.*, 363 Mich.

366, 109 N.W.2d 804 (1961). In construing a contract, under Michigan law, the court will select the construction that gives meaning to each of the provisions of the contract, so that no part of the contract is rendered meaningless. *United Rentals (North America), Inc. v. Keizer*, 202 F.Supp.2d 727 (W.D.Mich.,2002) (citing *Associated Truck Lines, Inc. v. Baer*, 346 Mich. 106, 77 N.W.2d 384 (1956)). A lease should not be interpreted in such a way as would leave one of its provisions substantially without force or effect, and to allow Ramco to withhold its consent simply because it wants to regain control over the Service Merchandise space would make the unlimited use provision in the Service Merchandise lease a nullity.

 The court can find no valid, business justification for Ramco withholding consent to the Michaels' sublease. Because consent cannot be reasonably withheld, Ramco's purchase rights under the overlease are not triggered. The court reserved ruling on whether the consent (and therefore purchase option) in the Service Merchandise lease was excised for purposes of assignment or for purposes of both the assignment *and* sublease to Michaels. Upon a finding that consent cannot be reasonably withheld, it is moot as to whether it is excised or not. To the extent that the court can render a decision that the consent and purchase options are excised as anti-assignment provisions in connection with the assignment and sublease, the court does so. However, to the extent that those provision remain valid and enforceable, the court finds that consent cannot be reasonably withheld to the sublease.[10]

10. Specific approval of the sublease was not asked for by the debtors or JLPK. However, the court notes that in an earlier opinion on this issue, the court held:

> The only issue before the court is whether this court has the jurisdiction to sanction the sublease between JLPK–Greensburgh, LLC and Michaels. The debtors argue that this court has approved subleases in the

## 2. The "Going Dark" Provision

 The Novi lease contains the following provision with respect to continuous operation:

> In the event that Tenant fails to operate its building on the leased premises for a continuous period of nine (9) months after Tenant opens for business for reasons other than damage or destruction by reason of fire, casualty, or eminent domain, Landlord shall have the right at any time thereafter while said premises are vacant to notify Tenant that it elects

past, and failure to do so here would amount to a celebration of form over substance. Westmoreland contends that while it is this court's task to oversee assumption and assignment, past that, the court has no jurisdiction to sanction the proposed Michael's sublease.

While Westmoreland's argument is attractive on its face, their argument ignores the practical realities of this particular transaction. The debtors' proposed assumption and assignment contemplates a contemporaneously effective sublease to Michael's. Within this case, the court has approved over forty subleases by Service Merchandise to various entities. If the debtors then assumed and assigned those subleases to an entity such as JLPK, it would be entirely within the court's domain to approve the transaction. Such is true here.

The debtors are proposing that the sublease become simultaneously effective with the assumption and assignment of their lease to JLPK–Greensburgh. The debtors are correct that to deny their motion or assumption and assignment based merely on the differing, but equally effective form of the transaction, would be a celebration of form over substance. If the court were to deny this transaction, it would be without prejudice[] to allow the debtors to first sublease to Michael's and then e-notice their assumption and assignment of that sublease to JLPK–Greensburgh. This perfunctory exercise would be a waste of precious estate assets and a waste of judicial resources.

*In re Service Merchandise Co., Inc.* Case No. 99–02649, Docket No. 7088, Opinion Entered July 15, 2002. This court emphasized that an important part of its ruling was the Westmoreland (the landlord) had specifically agreed that it had been adequately assured of future performance. Although Ramco, did not agree, this court has found that it has been adequately assured. If the debtors had first sublet to Michaels as it did to TJX, and then simultaneously assigned the entire lease to JLPK, the argument could not be made that this court lacked jurisdiction to approve the sublease.

Although no guidance is provided on this issue from other jurisdictions or from the legislative history of section 365, the court suspects that section 365 is broad enough to provide for this court's approval of the sublease to Michaels. It seems an impossibility that Congress would mandate the ultimate use of the property be considered for purposes of determining adequate assurance of future performance, but not permit the court to sanction the transaction to permit the assurances given to the landlord to actually take effect. This "catch 22" would mean that courts were forced to undertake an extensive, but futile analysis of a proposed end-user in a transaction to determine whether adequate assurance of future performance had been given, and then be without the ability to sanction the end-user's actual use.

In the transaction proposed by the debtors to assign to JLPK with a simultaneous sublease to Michaels, the only method to determine adequate assurance of future performance for purposes of financial strength, operating performance, percen age rent, exclusive provisions, use provisions and tenant mix issues is to consider Michaels as the subtenant. The purpose of the adequate assurance statute is to provide Ramco with the benefit of its bargain. Upon a sublease to Michaels, Ramco would be getting a financially stronger tenant (than Service Merchandise when it signed the lease), and a tenant which fulfils every purpose of the statute in granting Ramco the benefits of the lease it reached with Service Merchandise in 1980.

It is curious that the parties did not overtly request approval or disapproval of the Michaels' transaction, but did seek to have the court rule on issues such as consent, the purchase option and the going dark provision as they relate to the proposed sublease.

to purchase Tenant's leasehold improvements.

Apparently, Ramco has indicated to JLPK that it intends to exercise its option to purchase because the space has been or will be dark for more than nine months. The question before the court is whether this is in practical reality a veiled anti-assignment provision or an enforceable provision that would permit Ramco to exercise its option. The court finds that to the extent the lease provision, prevents debtor from assigning its lease to JLPK, it is unenforceable as de facto nonassignment clause under 11 U.S.C. § 365(f). *See In re Peaches Records & Tapes, Inc.*, 51 B.R. 583 (9th Cir. BAP 1985).

Beyond that, however, the court must find the provision enforceable. Courts will generally enforce provisions that treat the cessation of the debtor's business as a default. *See e.g., Worthington v. General Motors Corp. (In re Claremont Acquisition Corp., Inc.)*, 113 F.3d 1029 (9th Cir. 1997) (temporary cessation of business in violation of agreement created an incurable default that prevented assumption and assignment of car dealership franchise agreement). If the building is not operated for nine months, Ramco's purchase option is triggered. The question is how to count those nine months, and involves an interpretation of the lease provisions.

The lease requires no cessation of operation of the building for greater than nine months "after Tenant opens for business." The court finds that this means nine months from the effective date of the assignment. This finding is based in part because of the prejudice that resulted to the parties from the court's inability to

calendar this matter quickly. Had the court been able to hear this matter in July when scheduled, perhaps the "going dark" provision would not even be at issue.[11]

Therefore, while the court finds that the "go dark" provision is in full force and effect after assignment to JLPK, the provision is found to begin upon the effective assignment date. This will cure any delay caused by the court's inablity to hear the matter timely, and provide a clear date by which JLPK must "operate the building."

### Conclusions

For the reasons cited above, the court overrules Ramco's objections, and approves the assignment of the Novi lease to JLPK; finds that Ramco cannot reasonably withhold its consent to the Michaels' sublease, and finds the "going dark" provision in the Novi lease enforceable to the extent limited herein. The court orders counsel for JLPK and/or the debtors to submit an order not inconsistent with this court's Memorandum within ten (10) days of entry of this Memorandum.

It is therefore so ORDERED.

---

11. The lease provides for continuous operation "after Tenant opens for business." If the lease provisions are read as a whole, then it is possible that the parties contemplated that "tenant" may in fact refer to an assignee. The lease permits assignment and subleasing, and therefore, a reasonable reading of the lease indicates that the parties may have intended the nine month period to run from the effective assignment if one did occur.